## In re NORTHWEST AIRLINES CORP., et al., Antitrust Litigation.

### No. 96–74711.

United States District Court,
E.D. Michigan,
Southern Division.

May 16, 2002.

Garwin, Bronzaft, Gerstein & Fisher, L.L.P., by Bruce E. Gerstein, Noah Silverman, Joe Opper, New York City, Lead Counsel for All Plaintiffs.

Elwood S. Simon & Associates, P.C., by Elwood S. Simon, John Zuccarini, Lance C. Young, Birmingham, MI, Liaison Counsel for All Plaintiffs.

David P. Smith, Brad Gadel, Percy, Smith, Foote & Gadel, LLP, Alexandria, LA, Alfred G. Yates, Jerry Rutledge, Law Offices of Alfred G. Yates, Jr., Pittsburgh, PA, J. Gregory Odom, Andrew Kelly, Odom & Des Roches LLP, New Orleans, LA, Randall S. Acree, Odom & Des Roches, LLP, Hahira, GA, John Verner, Pam Linberg, Calvin, Richardson & Verner, Houston, TX, Patrick Cafferty, Andrew J. Morganti, Miller Faucher and Cafferty LLP, Ann Arbor, MI, Susan LaCava, Susan LaCava, S.C., Madison, WI, Samuel K. Rosen, James G. Flynn, Wechsler Harwood Halebian & Feffer LLP, New York City, R. Scott Palmer, Burt & Pucillo, LLP, West Palm Beach, FL, Adam Moskowitz, Kozyak Tropin & Throckmorton, P.A., Miami, FL, Gregory Keller, Harnes Keller LLP, New York City, Mitchell S. Arons, Arons & Solomon, Hackensack, NJ, for Plaintiffs.

Donald L. Flexner, James P. Denvir, III, Scott E. Gant, Boies, Schiller & Flexner LLP, Washington, DC, Lawrence G. Campbell, Dickinson Wright PLLC, Detroit, MI, for Northwest Airlines Corp. and Northwest Airlines, Inc.

Emmet J. Bondurant, II, Frank Lowrey, Neeli Ben–David, Bondurant Mixson & Elmore, LLP, Atlanta, GA, David A. Ettinger, Honigman, Miller, Schwartz & Cohn, Detroit, MI, for Delta Air Lines, Inc.

Henry C. Thumann, Ian Simmons, Benjamin G. Bradshaw, Andrew J. Trask, O'Melveny & Myers LLP, Washington, DC, Carl H. von Ende, Elisa M. Angeli, Miller, Canfield, Paddock & Stone, P.L.C., Detroit, MI, for U.S. Airways Group, Inc. and U.S. Airways, Inc.

J. Thomas Lenga, Clark Hill, P.L.C., Detroit, MI, Kevin D. McDonald, Edwin L. Fountain, Sarah Mackey Mathias, Jones, Day, Reavis, & Pogue, Washington, D.C., for Airlines Reporting Corporation.

## *OPINION AND ORDER REGARDING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

ROSEN, District Judge.

### I. *INTRODUCTION*

On October 11, 1996, Plaintiff Nelson Chase brought the first of these four consolidated antitrust actions on behalf of himself and other similarly situated air travelers, alleging that Defendants Northwest Airlines Corp., Northwest Airlines, Inc., Airline Reporting Corporation ("ARC") and others have conspired among themselves to restrain trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and that Defendant Northwest has engaged in unlawful monopolistic practices in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.[1] The three remaining suits were filed in 1999, with Defendants Northwest and ARC again named as Defendants, but with the addition of Defendants Delta Air Lines, Inc., U.S. Airways Group, Inc., and U.S. Airways, Inc. as parties. These four actions, with their substantially similar allegations, were consolidated for all pretrial purposes through a stipulated Order dated September 16, 1999.

As detailed in a prior Opinion and Order, *see Chase v. Northwest Airlines Corp.*, 49 F.Supp.2d 553 (E.D.Mich.1999), this case concerns the Defendant Airlines' refusal to sell so-called "hidden-city" tickets, whereby a passenger who wishes to travel to or from one of the Airlines' hub airports is able to obtain a cheaper fare by purchasing a "spoke-hub-spoke" ticket that encompasses the desired "hub-spoke" route, and then simply discarding the unused portion of the ticket. Each of the Defendant Airlines has adopted a policy prohibiting the sale of such tickets, and the Airlines also have devised various mechanisms to enforce their prohibi-

---

1. The initial complaint also asserted claims under Michigan antitrust law, but these claims were omitted from Plaintiff's more recent amended complaints.

tions. Plaintiffs allege that the Defendant Airlines, Defendant ARC, and others have conspired to enforce these prohibitions, and that each Airline's separate prohibition constitutes an unlawful exercise of monopoly power over many of the routes that originate or terminate at its hub airports.

By motion filed on November 15, 2000, Plaintiffs now request certification of several proposed classes of airline customers under Fed.R.Civ.P. 23, including: (i) a class of ticket purchasers who seek injunctive relief from Defendants' alleged Section 1 and 2 violations; (ii) a class of ticket purchasers who purportedly suffered monetary losses as a result of Defendants' alleged Section 1 conspiracy to eliminate hidden-city ticketing; and (iii) subclasses of customers of each individual Defendant Airline who seek to recover damages for each Airline's alleged violation of Section 2. For their part, the Defendant Airlines filed a motion for summary judgment on November 15, 2000, arguing that Plaintiffs' Section 1 and 2 claims are deficient as a matter of law in a number of respects.

Both of these motions have been fully briefed by the parties. In addition, on November 14, 2001, the Court heard oral argument on these matters. Having reviewed the parties' submissions and the voluminous record, and having considered the arguments of counsel at the November 14 hearing, the Court now is prepared to rule on Plaintiffs' and the Airline Defendants' motions. This Opinion and Order sets forth the Court's rulings.[2]

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

The parties have submitted lengthy recitations of the facts of this case,[3] and have provided innumerable boxes of exhibits in support of their respective positions. Needless to say, a full account of all of the facts of this case would fill an entire volume of the

Federal Supplement. Accordingly, what follows is necessarily a summary of the most pertinent facts and circumstances, with more details to follow as necessary to the Court's analysis of the arguments raised in the parties' motions.

### A. The Parties to These Actions

The named Plaintiffs in this consolidated action are Nelson Chase, Norman Volk, Nitrogenous Industries Corp., and Keystone Business Machines, Inc. The Defendants are (i) Northwest Airlines Corp. and Northwest Airlines, Inc. (collectively "Northwest"); (ii) U.S. Airways Group, Inc. and U.S. Airways, Inc. (collectively "U.S. Airways"); (iii) Delta Air Lines, Inc. ("Delta"); and (iv) Airline Reporting Corporation ("ARC").

Defendant ARC is an airline trade association owned and controlled by its constituent member airlines. ARC provides accreditation for travel agencies and a central clearinghouse for ticket sales made by these agencies. The remaining Defendants, of course, are major passenger airlines that provide air travel service throughout the nation and the world.

Each of the named Plaintiffs purchased at least one unrestricted, full-fare ticket from one of the Defendant Airlines during the relevant time period—on or after October 10, 1992, as to the claims against Northwest; on or after May 18, 1995, as to the claims against U.S. Airways; and on or after June 11, 1995, as to the claims against Delta. These ticket purchases all involved travel that began or ended at a Defendant Airline's hub airport—either Minneapolis, Detroit, or Memphis, for Northwest; Pittsburgh or Charlotte, for U.S. Airways; and Atlanta and Cincinnati, for Delta. In all, Plaintiffs have identified 234 "Affected City–Pair Routes" that begin or end at one of these hub airports.[4] The named Plaintiffs seek to serve

---

**2.** Defendant ARC filed a separate motion for summary judgment on November 15, 2000. The Court orally granted this motion at the November 14 hearing, and will issue a separate Opinion and Order setting forth the grounds for this ruling.

**3.** Tellingly, Plaintiffs did not even attempt to state the facts of their case within the confines of

the 50–page briefing limit established by stipulation of the parties, but instead submitted a separate "Factual Appendix" that includes 267 numbered paragraphs and spans 169 pages.

**4.** To be completely accurate, Plaintiffs and their experts have identified 246 city-pair routes as the relevant markets for their antitrust claims.

as class representatives for all passengers who purchased unrestricted, full-fare tickets on or after the above-cited dates for travel on one of these "Affected City–Pair Routes."[5]

## B. The Practice of "Hidden–City" Ticketing

This case arises from the Defendant Airlines' efforts to discourage or eliminate the practice of "hidden-city" ticketing (also referred to as "point-beyond" ticketing). To use an example that has become ubiquitous in these proceedings, consider a passenger who wishes to travel from New York to Northwest's hub airport in Detroit. Upon calling Northwest or a travel agent to inquire about fares, this passenger might discover that the unrestricted, one-way full fare for travel from New York to Detroit is $394.00. However, upon further inquiry, the passenger might learn that a one-way full fare ticket for travel from New York to Columbus, Ohio costs only $238.73.[6] Yet, because of the hub-and-spoke layout of Northwest's flight network, it happens that a trip from New York to Columbus actually involves two segments, one from New York to Detroit and one from Detroit to Columbus. Thus, a savvy—or, Defendants would say, unscrupulous—traveler might elect to purchase a New York–Columbus ticket, disembark in Detroit, and simply throw away the unneeded portion of the ticket for travel from Detroit to Columbus.[7]

The Defendant Airlines oppose this practice, and have devised various measures to prevent it. The focus of this case is to determine the reasons for this opposition, and the lawfulness of these reasons. Plaintiffs allege that Defendants have two motives for seeking to eliminate the practice of hidden-city ticketing: (i) an agreement among themselves and other airlines that they would do so; and (ii) a concern that this practice, if permitted, would undermine the Airlines' overall fare structure, including an alleged "hub premium" imposed upon passengers traveling to or from hub airports by virtue of the Airlines' alleged monopoly power at these airports. Plaintiffs further assert that the first of these motivations violates Section 1 of the Sherman Act, and that the second violates Section 2.

The Defendant Airlines, for their part, deny that they have acted in concert in adopting and enforcing their rules against hidden-city ticketing, deny that they possess monopoly power at their respective hub airports, and affirmatively contend that their

However, 12 of these routes are double-counted, as they involve travel between two Defendants' hub airports. It also should be noted that these 246 routes do not exhaust all, or even most, of the cities served by the Defendant Airlines from their hub airports. However, Plaintiffs' experts have excluded various city-pairs from their analysis, including (i) "short haul" routes of less than 150 miles, where ground transportation could readily serve as a substitute for air travel; (ii) low-travel routes, involving fewer than 30,000 round-trip passengers per year, as such low volumes likely could support only one airline, and thereby create "natural monopoly" situations; and (iii) routes on which the Defendant hub carrier holds less than a 50–percent market share, under the reasoning that it would be more difficult to establish monopoly power on such routes. (*See* Plaintiffs' Exhibits, Tab 71, Beyer Expert Report at 24–25.)

5. More specifically, Plaintiffs propose a single "injunctive class" for all such passengers, a single "damages class" of all such passengers for purposes of their Section 1 antitrust conspiracy claim, and three separate "damage classes" of customers of each individual Defendant Airline for purposes of their Section 2 antitrust claims.

6. As indicated in the Court's prior published opinion in this case, these fares were the ones in effect on September 29, 1995. *See Chase*, 49 F.Supp.2d at 557 n. 7.

7. The parties also occasionally refer to the practice of "back-to-back" ticketing, which involves the purchase of two round-trip tickets for travel in opposite directions—for example, New York/Detroit and Detroit/New York—and permits the purchaser to avoid the premium charged for travel that does not satisfy a minimum-stay requirement. For example, if a business traveler wished to make a round trip between New York and Detroit on two consecutive midweek days, thereby failing to qualify for a less expensive fare involving a Saturday stayover, he might discover that it is cheaper to purchase *two* discounted round-trip tickets, each including a Saturday stayover, and to use only the first legs of these two tickets to form a composite midweek round-trip ticket, rather than purchasing a single, much more expensive round-trip ticket that reflected his actual travel plans. The practice of back-to-back ticketing, though sometimes relevant to the arguments made by the parties, is not directly at issue in this case.

fare structures are an economically rational and wholly lawful means to recover the fixed costs of their hub-spoke systems, notwithstanding that these fare structures might give rise to the occasional hidden-city fare anomaly. Defendants further assert that each Airline may lawfully protect its fare structure by prohibiting hidden-city ticketing, and that, in the face of these prohibitions, a passenger's attempt to employ the practice of hidden-city ticketing is tantamount to fraud.

## C. The History of the Airlines' Prohibitions on Hidden–City Ticketing

### 1. The Airlines' Tariff Rules Against Hidden–City Ticketing

Over the course of the 1980's, each of the Defendant Airlines, as well as several other airlines, adopted two tariff rules that have some bearing upon the practice of hidden-city ticketing. The first of these, Tariff Rule 100, dealt only indirectly with the practice (at least in the form initially enacted by the airlines), but the second, Tariff Rule 1,[8] was more explicit in its prohibition. These and other tariff rules are incorporated by reference into the "contract of carriage" that is a part of each passenger ticket.

As an example, Northwest adopted its version of Rule 100 in 1983, and this rule provides, in pertinent part:

*TICKETS—GENERAL*

(A) No person shall be entitled to transportation except upon presentation of a valid ticket. Such ticket shall entitle the passenger to transportation only between point of origin and destination and via the routing designated thereon.

(B) Flight coupons will be honored only in the order in which they are issued, and only if all unused flight coupons and the passenger coupons are presented together. (Defendants' Exhibits, Tab 1, A–9.) Some airlines (*e.g.*, Delta), but not others (*e.g.*, Northwest), issued detailed amendments to Rule 100 that expressly address hidden-city ticketing. Delta's 1997 version of Rule 100,

for example, includes language that "specifically prohibits the practice[ ] commonly known as … 'HIDDEN CITY/POINT BEYOND TICKETING.'" (*Id.* at A–16.)

As noted, the Airlines' Rule 1 is more directly applicable to hidden-city ticketing. For example, Northwest's initial Rule 1, as adopted in 1983, states in pertinent part:

(E) Fares apply for travel only between the points for which they are published. Tickets may not be issued at fare(s) published to and/or from a more distant point(s) than the points being traveled, even when issuance of such tickets would produce a lower price.

(*Id.* at A–24.) By 1988, each of the Defendant Airlines had adopted this rule, or one to similar effect. Some Airlines (*e.g.*, Northwest) amended their versions of this rule to more expressly identify the means of its enforcement and consequences of its violation. As amended in 1987, Northwest's Rule 1 now provides, in pertinent part:

(E) Fares apply for travel only between the points for which they are published. Tickets may not be issued at fare(s) published to and/or from a more distant point(s) than the points being traveled, even when issuance of such tickets would produce a lower fare. When a through or connecting passenger enplanes at an intermediate point between the origin and destination shown on his/her ticket, NW may require evidence, such as a boarding pass, of use of a preceding flight for the portion of the ticket from point of origin to intermediate point. Absent such evidence, NW may require additional fare collection from the passenger for any difference between the fare paid for the ticket from origin to destination and the fare which would apply from the intermediate boarding point to the destination.

(*Id.* at A–26.)

Until the mid 1980's, one of the mechanisms used by the Airlines to enforce their tariff rules was the Air Traffic Conference ("ATC"), the predecessor to Defendant ARC.[9] In particular, ATC required that each

---

8. U.S. Airways' version of this rule was designated Rule 150.

9. ATC was a division of the Air Transport Association ("ATA"), a trade group of 22 passenger

accredited travel agent enter into a "Passenger Sales Agency Agreement," under which the agent agreed to "adhere to and comply with" the Airlines' tariffs. (Plaintiffs' Exhibits, Tab 11, Passenger Sales Agency Agreement at 11.) The failure to do so could lead to a loss of accreditation.

In 1984, the travel agent oversight function of ATC was assumed by Defendant ARC. However, ARC abandoned ATC's practice of assisting in the enforcement of the Airlines' tariff rules, and removed any reference to tariffs from its "Agent Reporting Agreement" (the successor to ATC's "Passenger Sales Agency Agreement"). ARC's reason for doing so was an investigation conducted by the Civil Aeronautics Board ("CAB"), which had expressed antitrust concerns with any collective tariff enforcement efforts through an airline trade group. As stated in a 1992 letter from an ARC representative to Delta Air Lines:

> ARC's jurisdiction does not extend to individual carrier tariff-related matters .... While under the controlling agreement of ARC's predecessor, the Air Traffic Conference, an agent was obligated to "adhere to and comply with the tariffs, rules and regulations of the carriers", ... thereby providing ATC with jurisdiction over agents failing to comply with applicable tariffs; parallel language was *not* carried over to the ARC Agent Reporting Agreement. This omission was intentional, reflecting not only the competitiveness brought about by deregulation of the airline industry, but also attendant antitrust concerns.

(*Id.*, Dep. Ex. 737.)

As for other tariff enforcement efforts by the Airlines, Plaintiffs have produced a fair amount of evidence that, at least through the late 1980's, many airlines tolerated the practice of hidden-city ticketing and, in some cases, even encouraged it. Plaintiffs cite various newspaper articles which, in turn, quote airline executives as stating that their companies would have to "live with" the practice and that there was little they could do to prevent it, and which quote others in the air travel industry as stating that travel agents

could easily evade the airlines' uneven efforts to enforce their tariff rules against the practice. Likewise, Plaintiffs point to the deposition testimony of Jerry Strong, the manager of Northwest's agency audit department until 1988, that Northwest did not audit for hidden-city tickets while he worked in that department. Plaintiffs also have offered the affidavit of a former airline employee, Bruce Bishins, who recounts his efforts in the late 1970's and early 1980's—initially on behalf of Trans World Airlines, and then on behalf of the airlines collectively through the Air Traffic Conference—to teach the airlines' sales agents and independent travel agents how to write hidden-city tickets. Finally, Plaintiffs point to the 1988 edition of Defendant ARC's travel agent handbook, which expressly instructs agents on the practice of writing hidden-city tickets.

### 2. The Airlines' Discussions of Hidden–City Ticketing at Trade Association Meetings, and Their Formation of Industry "Fraud Prevention" Groups

According to Plaintiffs, the economics of the airline industry changed in response to the economic downturn experienced throughout the nation in the early 1990's. The result, according to Northwest memoranda offered by Plaintiffs, was to widen the gap between business and leisure fares, thereby increasing the incentive of business travelers to seek out hidden-city ticketing opportunities, as well as other devices for avoiding high business fares. Plaintiffs also cite newspaper accounts of surveys indicating the increased employment in the late 1980's and early 1990's of the practice of hidden-city ticketing and other fare-saving devices. They further point to reports and testimony indicating that travel agents felt more pressure in this time period to sell hidden-city tickets in order to keep pace with other agents who did so.

In Plaintiffs' view, these developments led the airlines to consider anew their responses to the practice of hidden-city ticketing. Whether or not one subscribes to this cause-and-effect theory, the record con-

airlines (including all three of the Defendant Airlines).

tains ample evidence that the airlines did, in fact, discuss the practice of hidden-city ticketing at various trade group meetings during this time frame. Plaintiffs trace this back to the mid–1980's, when the airlines collectively addressed a similar practice, involving international travel and known as "cross-border" ticketing, at meetings of the International Air Transport Association ("IATA"). In 1986, for example, the IATA formed a "Fraud Prevention Steering Group," which issued a report in 1987 stating that cross-border ticketing "is not fraud in the strict sense of criminal activity" and is "virtually impossible to detect," but "does however infringe IATA rules," and represents a "prevalent form of revenue dilution" and a "potentially substantial threat to yield maximization." (Plaintiffs' Exhibits, Tab 12, Dep. Ex. 206.) The report recommended that the airlines "take fraud prevention seriously," that they "make every effort to enhance systems and procedures to detect, evaluate and eliminate fraudulent practices," and that they take steps to "ensure that a dialogue and effective action takes place on fraud prevention measures." (*Id.*) This report was distributed as part of the agenda for a September 1987 joint conference of the IATA and its U.S. counterpart, the ATA, which was attended by representatives of Defendants Northwest and Delta, among other airlines.

Several airlines, including Northwest and Delta, responded to these recommendations by forming a "Joint IATA/ATC Cross Border Selling Working Group," which was charged, in part, with the task of developing and recommending solutions to the "fraud problem" created by cross-border ticketing. This group issued a 1988 report to the IATA which, among its various recommendations, proposed that the airlines report any agents who engaged in cross-border ticketing to the IATA Agency Administrator for "appropriate

compliance action." The report also recommended that the airlines develop in-house fraud prevention and detection programs, and that they alert other carriers whenever they detected an instance of cross-border selling involving the other carrier's tickets. Plaintiffs also offer evidence of other IATA meetings, fraud prevention seminars, and training sessions at which airline representatives discussed cross-border ticketing and possible means of preventing it.

Plaintiffs contend, in essence, that these IATA efforts served as a "blueprint" for a similar, if less overt, collective endeavor involving the domestic U.S. airlines and the domestic analogue to cross-border ticketing—namely, hidden-city ticketing.[10] This "crossover" allegedly began in 1990, when Mark Hawes, IATA's director of fraud prevention, wrote to Richard Lally, ATA's vice president for security, to propose a joint fraud prevention group that would, among other things, identify trends and "main areas" of fraud in the North American airline industry, collect and disseminate information through IATA and ATA to each airline's fraud representatives, and use industry training facilities to increase awareness of fraud prevention. (Plaintiffs' Exhibits, Tab 18.) Hawes also opined that ARC should attend this group's meetings.

The security committee of the ATA ratified this proposal in a March 1991 meeting, and a "Joint ATA/IATA North American Fraud Prevention Task Force" was formed as a result, with Defendant Northwest chairing this task force, and with representatives of Defendants U.S. Airways and ARC attending its meetings. The Northwest representative who chaired these meetings, Doug Laird, made a presentation to ATA's 1992 annual security workshop regarding the task force's activities. In addition, this task force met a number of times, during which its members

10. Plaintiffs further assert that, in moving from a discussion of international fare-related issues to U.S. fare-related concerns, even if only at IATA meetings, the airlines crossed the line from permissible conduct to impermissible antitrust violations. In support of this proposition, they cite the testimony of Michael Levine, Northwest's former head of marketing and pricing, that the airlines' antitrust immunity extended only to discussions of international pricing issues at IATA meetings, and not to any discussions of matters relating to domestic pricing or fares. In particular, Levine testified that "the discussion of domestic tariff abuse would not have been, in my judgment, immunized by and therefore would have been exposed in an IATA meeting." (Plaintiffs' Exhibits, Tab 90, Levine Dep. at 593.)

discussed tariff abuse issues, including hidden-city ticketing, and shared new methods for detecting the various forms of tariff abuse. The minutes of the March 17, 1993 meeting of this task force, for example, reflect a discussion as to whether practices such as hidden-city ticketing should be considered "simply as tariff matters," and thus outside the reach of ARC's enforcement role, or whether these practices should be "characterized as fraud," in light of their "elements of deception and dishonesty that were prejudicial to the airlines." (Plaintiffs' Exhibits, Tab 34, 3/17/93 Meeting Minutes at 6.) The minutes further indicate an agreement among the membership "that there were indeed problems in this area and that there was a need for an increasing awareness of these practices," but that "no positive action was proposed." (*Id.*)

In addition to suggesting the formation of this task force, IATA also, according to Plaintiffs, played an active role in urging airlines to combat various forms of even domestic "ticket fraud," including hidden-city ticketing. For example, IATA conducted a fraud prevention seminar in April of 1992 in Miami, during which a representative of American Airlines discussed methods of preventing hidden-city ticketing and other types of practices. The agenda for this seminar compared ticket fraud to shoplifting, stated that "[i]ndustry cooperation" was a "critical element in combating fraud," and set forth as the goal of the seminar to increase "industry consideration of ticket fraud and to establish what positive steps can be taken to improve industry responses." (Plaintiffs' Exhibits, Tab 19, ATA 01532.) In addition, Mark Hawes made a presentation at this seminar, and observed that "[a]nyone who has experience of policing well knows that the important thing is not necessarily how many you catch but how many you deter; and that unless a certain degree of 'presence' is apparent, the risk is that things can deteriorate to a level where recovery is at best painful and at worst impossible." (*Id.*, Dep. Ex. 389

at 4.) Hawes further opined that "if we don't want to lose control we need to have a clear message," and that "[w]e need to be telling the market that attempts to defraud airlines will be discovered and dealt with severely." (*Id.*) [11]

Regarding the impact of these IATA efforts, Plaintiffs point, for example, to the testimony of United's head of corporate security, Ken Gilbart, who stated:

Q: Prior to the issue being raised at the International Airline Transportation Association—that is IATA, correct?

A: Correct.

Q: Was United seeking to prohibit back-to-back ticketing?

A: Not in a very active way.

Q: Would the same answer be for hidden-city ticketing?

A: Correct.

Q: United was not actively enforcing hidden-city ticketing. Correct?

A: Not unless somehow or another we determined that a particular agency was very abusive in that area.

Q: So it was the people at IATA that stirred up the fire to start enforcing hidden-city ticketing and back-to-back in a more active way?

A: I don't know that I would characterize them as being the pot stirrer, but if you want to, that's fine, I guess.

Q: Well, would you consider—who stirred the pot for United Airlines, if they were not actively enforcing it prior to that time?

A: To the extent that tariff abuse was an agenda item on any of these meetings, some abusive practices were discussed. And more carriers were saying, yeah, we think this is a big problem. So I don't know if we were saying IATA did it first or ATA did it first, just it all got going kind of at the same time.

---

**11.** Other such fraud prevention seminars were held in 1993, 1994, and 1995. Hawes made another presentation at the 1993 seminar, in which he again made many of the same points. At the 1994 seminar, United Airlines' head of

corporate security, Ken Gilbart, gave a presentation on "tariff abuse" in which he addressed hidden-city ticketing. The participants have confirmed that hidden-city ticketing also was discussed at a workshop during the 1995 seminar.

(Plaintiffs' Exhibits, Tab 82, Gilbart Dep. at 92–93.)

Plaintiffs also offer other evidence of the Airlines' alleged use of IATA as a means of taking collective action against hidden-city ticketing. They note, for instance, that IATA's annual fraud survey for 1992 asked airlines to estimate their losses from various practices, including hidden-city ticketing, and that IATA's 1992 report of its 1991 fraud survey identified the "areas of most concern" as encompassing "tariff abuse including cross border or hidden city fares." (Plaintiffs' Exhibits, Tab 22, Dep. Ex. 383.) Moreover, in November of 1992, IATA issued a version of its "Fraud Detection Training Handbook" that addressed " 'Cross Border Sales' (or Hidden City Fares as it is called in the US)." (Plaintiffs' Exhibits, Tab 14, Dep. Ex. 102, § 13 at 1.) IATA conducted another survey in 1993, and again urged industry cooperation in addressing the issue of fraud.

According to Plaintiffs, these meetings, task forces, and the like led the Defendant Airlines and other domestic air carriers to adopt a uniform stance that hidden-city ticketing was a fraudulent practice that should be prevented. As evidence of this purported collective decision, Plaintiffs point first to a June 1992 memo by Donna Kizer–Devine, a regional manager in Defendant Delta's corporate security department, recounting what she had learned at the 1992 IATA fraud prevention seminar in Miami. This memo restated the recommendation of Mark Hawes that "the airline industry must tell the market that attempts to defraud the airlines . . . will be discovered and dealt with severely," and that a "proactive stance is necessary . . . because what is important is how many are deterred, not how many are caught." (Plaintiffs' Exhibits, Tab 19, Dep. Ex. 407.)[12]

More generally, Plaintiffs cite the testimony of various airline officials that the information shared at industry meetings gave them a better understanding of (i) the extent of the problem of tariff abuse, (ii) the best use of their resources to combat tariff fraud, and (iii) the efforts used by other airlines to prevent such occurrences.

Plaintiffs also assert that this alleged collective decision led to Defendant ARC's formation of a "Fraud Prevention Advisory Committee" in late 1992, for the stated purpose of assisting ARC's management in the development of a "Fraud Program." Several of the members of this committee, including representatives of all three Defendant Airlines, previously had participated in ATA's fraud prevention task force. Plaintiffs offer evidence that this committee provided another means through which the airlines were able to share information regarding hidden-city ticketing practices and prohibitions.

### 3. Other Alleged Examples of Collective Efforts to Eliminate Hidden–City Ticketing

In addition to this trade group involvement with hidden-city ticketing issues, Plaintiffs point to other evidence which, in their view, is suggestive of a collective effort by the airlines in the early 1990's to eliminate this practice. First, they cite Defendant Northwest's development of certain computer software, the Passenger Revenue Accounting ("PRA") system, which Northwest and its business partner, Andersen Consulting, began to share with other airlines in 1992.[13] While the PRA system apparently does not directly identify instances of hidden-city ticketing, Plaintiffs have produced evidence that it facilitates the detection of this practice, as part of its general detection of tariff viola-

---

12. Plaintiffs note that, shortly after this memo was sent, Delta reorganized its corporate security department and began, for the first time, to address the general issue of "loss prevention." However, the record does not support Plaintiffs' further suggestion that this loss prevention program was directed in part at the practice of hidden-city ticketing. To the contrary, Delta's security personnel, when questioned at their depositions, did not seem particularly familiar with the practice of hidden-city ticketing, nor did they state that the 1992 reorganization of Delta's corporate security department encompassed any particular effort to deter hidden-city ticketing.

13. In May of 1992, Northwest licensed the PRA system to Andersen, which in turn began to license and market the software to other airlines through a wholly-owned subsidiary called PRA Solutions. PRA Solutions formed an advisory board, consisting of one representative from each airline which had purchased a software update service.

tions, by automating the ticket auditing process that previously had been performed manually, and thereby identifying potential tariff violations that could be further investigated by an airline's revenue accounting staff.

Plaintiffs further point to evidence that, beginning in 1992, the airlines touted their improved technology and computer systems for detection of such practices as hidden-city ticketing. A March 30, 1992 article in the Atlanta Journal and Constitution, for example, quoted Delta Air Lines executive Bob Blumberg as stating at a conference of travel agents that "Delta and other carriers are developing software to combat such tactics" as hidden-city ticketing, and that "the new systems, due to roll out in the next 12 to 24 months, will audit every ticket to match the segments flown with the reservation made." (Plaintiffs' Exhibits, Tab 26, Dep. Ex. 370.)

Plaintiffs also have placed into the record various warning letters issued by the airlines to travel agents regarding the practice of hidden-city ticketing. In June of 1992, for example, Defendant Northwest prepared a form letter reminding travel agents that "[d]omestic published tariffs prohibit hidden-city and point-beyond ticketing," and cautioning that "Northwest Airlines will audit all agencies believed to be ticketing hidden cities . . . regardless of agency size or geographic location." (Plaintiffs' Exhibits, Tab 26, NWC 0039123.) Northwest also issued a letter to a particular travel agent in July of 1992, noting an apparent hidden-city ticketing "discrepanc[y]," and warning that such "violations are considered fraudulent by Northwest Airlines and will not be tolerated." (Plaintiffs' Exhibits, Tab 28, NW 63768.) Plaintiffs also have produced a September 9, 1992 newspaper article recounting warnings issued by Defendants Delta and Northwest to travel agents regarding hidden-city and other such ticketing practices.

Next, Plaintiffs cite evidence of communications among the airlines' fraud prevention personnel regarding tariff abuse and, more specifically, hidden-city ticketing. For example, Ken Gilbart of United testified about the formation of an ATA fraud task force in 1992 or 1993, and confirmed that the airlines' security directors used the meetings of this task force to discuss problems of tariff abuse, including hidden-city ticketing, and to share new methods for detecting such abuses. Continental Airlines' director of fraud prevention, Fred Koch, testified to similar sorts of discussions with his colleagues at other airlines. Plaintiffs further cite mid–1992 Northwest memoranda that disclose information obtained from the airline's competitors regarding their various efforts to monitor and enforce hidden-city ticket prohibitions.

Finally, Plaintiffs have presented evidence of Defendant Northwest's attempt in the fall of 1993 to enlist ARC in the effort to identify and eliminate hidden-city ticketing. An August 1993 internal Northwest memo surveyed various industry groups, including IATA, ATA, and ARC, in an effort to identify a "policeperson" on the matters of hidden-city and back-to-back ticketing, but reported that an ARC representative "strongly feels that [ARC] would not be willing to intervene on this issue," in light of possible antitrust concerns. (Plaintiffs' Exhibits, Tab 34, Dep. Ex. 605.) Nevertheless, at an ARC Executive Committee meeting in September of 1993, attended by representatives of all three Defendant Airlines, Northwest executive Mark Osterberg proposed "that ARC look into the possibility of detecting and enforcing tariff violations such as back-to-back ticketing and hidden city ticketing," and "it was agreed that ARC would examine the issue, including technical and legal concerns." (Plaintiffs' Exhibits, Tab 34, Dep. Ex. 400 at ARC00109.) This matter was again raised at the next Executive Committee meeting in October of 1993.

In support of its proposal, Northwest argued that "[t]ariff violations result in *theft*," and that such violations came within ARC's right to enforce the "Agent Reporting Agreement" governing each travel agent. (*Id.* at ARC00124.) Northwest further asserted that "each airline could individually enforce tariff rules," but that "enforcement of certain published tariffs by ARC would likely be more efficient and effective," in part because "known enforcement would likely *deter* violations," which was the "real objective of enforcement." (*Id.*) Northwest also provided a

letter to ARC's general counsel stating that it had "analyzed the antitrust implications" of using ARC to police hidden-city and back-to-back ticketing practices, and had concluded that "ARC may enforce travel agency compliance with airline rules without fear of violating the antitrust laws." (Plaintiffs' Exhibits, Tab 34, Dep. Ex. 399 at ARC00317.) Despite these efforts, Northwest's proposal was not adopted.[14]

### D. Plaintiffs' Specific Claims of Sherman Act Violations

Against this factual backdrop, the Court now turns to Plaintiffs' specific claims in this case. First, Plaintiffs allege that the Defendant Airlines, ARC, and other non-party airlines agreed among themselves to deter the practice of hidden-city ticketing, allegedly so that this practice would not jeopardize each Airline's ability to charge supra-competitive fares for travel on many of the routes to and from its hub airports. Plaintiffs assert that this was a conspiracy in restraint of trade, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

As the Court observed at the November 14, 2001 hearing, and as acknowledged by Plaintiffs' counsel, the precise form of this alleged conspiracy has evolved through further development of the factual record. Initially, Plaintiffs alleged "that competing carriers conspired through ARC to successfully implement [the Airlines'] refusal to sell policy." *Chase*, 49 F.Supp.2d at 564. It is now plain that ARC was not the instrument through which the Airlines implemented their hidden-city ticket prohibitions; indeed, as noted earlier, the Court has concluded that ARC is entitled to summary judgment for lack of evidence that it even participated in a conspiracy to adopt or enforce such prohibitions. Instead, Plaintiffs now allege that, in the early 1990's, the Airlines abandoned their past, disparate policies and enforcement efforts regarding hidden-city ticketing, and collectively adopted a uniform stance designed to substantially deter the practice of hidden-city ticketing, focused around a collective determination that this practice should be deemed "fraudulent" and treated as "tariff abuse."

Next, Plaintiffs have asserted claims against each of the individual Defendant Airlines under § 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs allege that each of the Airlines possesses monopoly power over many of the "city-pair" markets that offer air travel to or from the Airline's hub airports.[15] Plaintiffs further allege that each Airline has exercised this monopoly power in an anticompetitive manner by prohibiting the practice of hidden-city ticketing, and thereby defeating a mechanism through which consumers in the relevant city-pair markets could otherwise avoid the supra-competitive "hub premiums" imposed by the Airlines in these markets.

These § 2 claims rest principally upon the expert testimony of economist John C. Beyer, Ph.D., and his colleague, Dr. Gary French, who have opined: (i) that the Defendant Airlines possess monopoly power in the relevant city-pair markets; (ii) that they have exercised this power to charge "hub premiums" for travel in these markets, thereby giving rise to the hidden-city fare phenomenon; and (iii) that the members of the various Plaintiff classes have been overcharged in an aggregate amount in excess of $950 million, beyond what these air travelers would have paid if the Airlines had not prevented them from taking advantage of competitive hidden-city fares for travel on the desired hub-spoke routes.[16]

14. The proposal apparently was never formally voted upon, but was merely tabled, for reasons that do not appear in the record.

15. As noted earlier, Plaintiffs and their experts have identified seven hub airports and 234 city-pairs upon which their claims in this case are based. Their § 2 claims, however, exclude certain of these city-pairs that involve routes between two airlines' hub airports.

16. Defendants previously filed a motion to exclude the proposed testimony of Plaintiffs' experts as failing to satisfy the standards of Fed. R.Evid. 702. In a recently issued Opinion and Order, the Court rejected this challenge, finding that Plaintiffs' expert testimony satisfied the Court's gatekeeping inquiry under Rule 702, at least under the present evidentiary record. As discussed below, this ruling somewhat foretells the defeat of several of the Airlines' present arguments in support of their motion for summary judgment and in opposition to Plaintiffs' motion for class certification.

### III. *THE DEFENDANT AIRLINES'*
### *MOTION FOR SUMMARY*
### *JUDGMENT*

#### A. The Standards Governing Defendants' Motion

In their present motion, the Defendant Airlines seek summary judgment in their favor on Plaintiffs' antitrust claims under both Section 1 and Section 2 of the Sherman Act. This motion, of course, is governed by the familiar standards set forth in Federal Rule of Civil Procedure 56, under which summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)— ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment.[17] As explained in *Celotex:*

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. In considering a defendant's motion for summary judgment, then, the question is "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented," and the "mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to satisfy this test. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. When performing this inquiry, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." 477 U.S. at 255, 106 S.Ct. at 2513.

These same principles govern, of course, in cases brought under the Sherman Act. In fact, one of the Supreme Court's above-cited trilogy of summary judgment decisions, *Matsushita,* itself was an antitrust case. As in other complex fields, however, substantive antitrust law has placed a gloss upon the traditional standards for resolving a motion for summary judgment. The *Matsushita* Court observed that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case," and that, to withstand a motion for summary judgment, a plaintiff "must present evidence that tends to exclude the possibility that the alleged conspirators acted independently" *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356 (internal quotations and citation omitted). Similarly, under § 2, if a defendant advances a legitimate business explanation for its allegedly anticompetitive conduct, the plaintiff must produce probative evidence tending to rebut this explanation in order to defeat a motion for summary judgment. *See Beard v. Parkview Hosp.,* 912 F.2d 138, 145 (6th Cir.1990). With these principles in mind, the Court turns to Defendants' motion.

#### B. Plaintiffs' Section 1 Antitrust Conspiracy Claim

##### 1. The Defendant Airlines Are Not Entitled to Summary Judgment Under the So–Called "Fraud Prevention" Exception to Sherman Act Liability.

The cornerstone of Defendants' present challenge to Plaintiffs' Section 1 antitrust conspiracy claim is set forth with unmistakable clarity in the Airlines' brief, where they declare that the practice of hidden-city ticketing "is fraud." (Defendants' Motion, Br. in Support at 11.) Defendants then explain:

> [Hidden-city ticketing] is an intentional effort on the part of a passenger to trick an

---

**17.** "[T]aken together, these three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."

10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure,* § 2727, at 468 (1998) (footnote omitted).

airline through false pretenses into selling transportation services at a price that the airline would not be willing to accept if the passenger had truthfully represented his intended itinerary. In doing so, the passenger also breaches his contract of carriage with the airline. Misrepresenting one's intended itinerary to get air transportation services at a price the airline would not otherwise have charged is no different from lying to get a bereavement fare, misrepresenting one's age to get a senior citizen discount at the movies, or switching price tags on merchandise at a grocery store.

(*Id.*) Having thus stated their premise, Defendants appeal to decisions in which the Supreme Court recognized that certain exchanges of information among competitors do not run afoul of § 1 of the Sherman Act, where such exchanges are necessary to prevent fraud. It follows, in Defendants' view, that the Airlines' joint discussions of hidden-city ticketing at trade association meetings and on other occasions do not give rise to Sherman Act liability for an antitrust conspiracy.

In considering this contention, it is helpful to begin with the Supreme Court decision that first established a "fraud prevention" exception to antitrust liability. In *Cement Mfrs. Protective Ass'n v. United States*, 268 U.S. 588, 590–91, 45 S.Ct. 586, 587, 69 L.Ed. 1104 (1925), the Court addressed the antitrust implications of a trade association of cement manufacturers that was formed for the stated purpose of collecting and disseminating "such accurate information as may serve to protect each manufacturer against misrepresentation, deception and imposition, and enable him to conduct his business exactly as he pleases in every respect." The Government brought suit against this trade association and its members, charging that certain of the association's practices violated § 1 of the Sherman Act, and requesting that it be enjoined from further such violations.

At the outset of its analysis, the Court observed that "[c]ement is a thoroughly standardized product," that the manufacturers which comprised the membership of the defendant association were "competitors in the business of shipping the product in interstate commerce," and that, even before this association was formed, "there was substantial uniformity of trade practices in the cement trade," so that the adoption of such practices by cement manufacturers was not the product of any conspiracy among association members. 268 U.S. at 591, 593, 45 S.Ct. at 587. The Court then described the particular conduct challenged by the Government, relating to "specific job contracts":

The specific job contract is a form of contract in common use by manufacturers of cement whereby cement is sold for future delivery for use in a specific piece of construction which is described in the contract. As was stated in the opinion of the court below, they are contracts "whereby a manufacturer is to deliver, in the future, cement to be used in a specific piece of work, such as a particular building or road, and the obligation is that the manufacturer shall furnish and the contractor shall take only such cement as is required for or used for the specific purpose." These contracts have, by universal practice, been treated by cement manufacturers as, in effect, free options customarily made and acted upon on the understanding that the purchaser is to pay nothing until after the delivery of the cement to him; that he is not obligated in any event to take the cement contracted for unless he chooses to; that he is not held to the price named in the contract in the event of a decline in the market price; whereas the manufacturer may be held to the contract price if the market advances and may be held for the delivery of the full amount of cement required for the completion of the particular piece of construction described in the contract. The practical effect and operation of the specific job contract therefore is to enable contractors who are bidding upon construction work to secure a call or option for the cement required for the completion of that particular job at a price which may not be increased, but may be reduced if the market declines. It enables contractors to bid for future construction work with the assurance that the requisite cement will be available at a definitely ascertained maximum price.

In view of the option features of the contract referred to, the contractor is involved in no business risk if he enter into several specific job contracts with several manufacturers for the delivery of cement for a single specific job. The manufacturer, however, is under no moral or legal obligation to supply cement except such as is required for the specific job. If, therefore, the contractor takes advantage of his position and of the peculiar form of the specific job contract, as modified by the custom of the trade, to secure deliveries from each of several manufacturers of the full amount of cement required for the particular job, he in effect secures the future delivery of cement not required for the particular job, which he is not entitled to receive, which the manufacturer is under no legal or moral obligation to deliver, and which presumably he would not deliver if he had information that it was not to be used in accordance with his contract. The activities of the defendants complained of are directed toward securing this information and communicating it to members, and thus placing them in a position to prevent contractors from securing future deliveries of cement which they are not entitled to receive under their specific job contracts, and which experience shows they endeavor to procure especially in a rising market.

Members are required to make to the secretary of the association prompt reports of all specific job contracts, describing in detail the contract and giving the name and address of the purchaser; the amount of cement required, the price and delivery point; also the date of expiration of the contract . . . . The association also employs "checkers," whose business it is, by actual inspection and inquiry, to ascertain, so far as possible, the amount of cement required for specific jobs referred to in specific job contracts, and whether cement shipped under specific job contracts is actually used or required for use under such contracts . . . . [W]e accept fully the government's contention that the defendants regularly take all practicable steps to ascertain whether cement contracted for under the specific job type of contract was actually being used for the job described in the

contract, and that the fullest information with respect to such contracts and the use of cement shipped under said contracts is reported to the members of the association through the mediation of the secretary.

The government does not contend that the activities of the association with respect to specific job contracts diminished the number of such contracts, or that they diminished in any way the obligations of members of the association upon such contracts. There is, however, abundant evidence to show that there were actual c[a]ncellations of deliveries on the ground that contractors were not entitled, under the terms of their contracts, to receive such deliveries. In 1920, of 1,392 contracts investigated and found to be "padded" to the extent of more than 3,500,000 barrels of cement, 978 were partially canceled to the extent of 2,014,653 barrels.

268 U.S. at 594–97, 45 S.Ct. at 588–89.

While conceding that there was no "agreement or understanding between the defendants placing limitations on either prices or production," the Government nonetheless charged that "uniformity of prices and limitation of production [we]re necessary results" of the manufacturers' sharing of information concerning specific job contracts. 268 U.S. at 592, 45 S.Ct. at 587. Even assuming such indirect effects, however, the Supreme Court held that, under the circumstances, the dissemination of specific job contract information among association members did not constitute an unlawful conspiracy in restraint of trade:

That a combination existed for the purpose of gathering and distributing [specific job contract] information is not denied. That a consequence of the gathering and dissemination of information with respect to the specific job contracts was to afford, to manufacturers of cement, opportunity and grounds for refusing deliveries of cement which the contractors were not entitled to call for, an opportunity of which manufacturers were prompt to avail themselves, is also not open to dispute. We do not see, however, in the activity of the defendants with respect to specific job contracts any basis for the contention that

they constitute an unlawful restraint of commerce. The government does not rely on any agreement or understanding among members of the association that members would either make use of the specific job contract, or that they would refuse to deliver "excess" cement under specific job contracts. Members were left free to use this type of contract and to make such deliveries or not as they chose .... It may be assumed, however, if manufacturers take the precaution to draw their sales contracts in such form that they are not to be required to deliver cement not needed for the specific jobs described in these contracts, that they would, to a considerable extent, decline to make deliveries, upon receiving information showing that the deliveries claimed were not called for by the contracts.

Unless the provisions in the contract are waived by the manufacturer, demand for and receipt of such deliveries by the contractor would be a fraud on the manufacturer, and in our view the gathering and dissemination of information which will enable sellers to prevent the perpetuation of fraud upon them, which information they are free to act upon or not as they choose, cannot be held to be an unlawful restraint upon commerce, even though in the ordinary course of business most sellers would act on the information and refuse to make deliveries for which they were not legally bound.

.... [W]e cannot regard the procuring and dissemination of information which tends to prevent the procuring of fraudulent contracts or to prevent the fraudulent securing of deliveries of merchandise on the pretense that the seller is bound to deliver it by his contract, as an unlawful restraint of trade even though such information be gathered and disseminated by those who are engaged in the trade or business principally concerned.

268 U.S. at 603–04, 45 S.Ct. at 591.

In so ruling, the Court cited a case decided the same day, *Maple Flooring Mfrs. Ass'n v. United States,* 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925), involving the activities of a trade association of corporations engaged in the business of selling wood flooring. The defendant association gathered from and disseminated to its members information concerning (i) the average cost to members of various dimensions and grades of flooring, (ii) standard freight rates for shipment of flooring, (iii) quantities and kinds of flooring sold, and (iv) the prices charged by members for these sales. In that case, the Government "neither alleged nor proved that there was any agreement among the members of the association either affecting production, fixing prices, or for price maintenance," and the constituent members of the trade association remained "free to sell their product at any price they cho[ ]se and to conduct their business as they please[d]." 268 U.S. at 567, 45 S.Ct. at 579. "On the contrary, the defendants offered a great volume of evidence tending to show that the trend of prices of the products of the defendants corresponded to the law of supply and demand and that it evidenced no abnormality when compared with the price of commodities generally." 268 U.S. at 567–68, 45 S.Ct. at 579.

Under these facts, the Court held that the defendant trade association's compilation and distribution of historical information regarding the activities of its constituent members did not, standing alone, violate the Sherman Act:

We realize that such information, gathered and disseminated among the members of a trade or business, may be the basis of agreement or concerted action to lessen production arbitrarily or to raise prices beyond the levels of production and price which would prevail if no such agreement or concerted action ensued, and those engaged in commerce were left free to base individual initiative on full information of the essential elements of their business. Such concerted action constitutes a restraint of commerce and is illegal and may be enjoined .... But in the absence of proof of such agreement or concerted action having been actually reached or actually attempted, under the present plan of operation of defendants we can find no basis in the gathering and dissemination of such information by them or in their activities under their present organization for

the inference that such concerted action will necessarily result . . . .

We decide only that trade associations or combinations of persons or corporations which openly and fairly gather and disseminate information as to the cost of their product, the volume of production, the actual price which the product has brought in past transactions, stocks of merchandise on hand, approximate cost of transportation from the principal point of shipment to the points of consumption as did these defendants and who, as they did, meet and discuss such information and statistics without however reaching or attempting to reach any agreement or any concerted action with respect to prices or production or restraining competition, do not thereby engage in unlawful restraint of commerce. 268 U.S. at 585–86, 45 S.Ct. at 585–86.

■ Upon reviewing the decisions in *Cement Manufacturers* and *Maple Flooring*, the Court finds that they speak to some aspects of the present case, but not to others. In the former category, at least some of the information gathered and disseminated by airline industry groups, including the IATA and the ATA, concerned the airlines' individual, historical efforts at tariff enforcement. This activity falls within the rule of *Maple Flooring*—namely, while such information might conceivably be used as an aid to collective efforts, it is not unlawful, in itself, to gather and share such information as to past practices, so long as this activity is not a stepping stone to concerted anticompetitive measures.

Moreover, regarding Defendants' claim of "fraud prevention" within the rule of *Cement Manufacturers*, Plaintiffs apparently do not dispute that the practice of hidden-city ticketing requires a passenger to breach an airline's tariff rules and contract of carriage, which are incorporated by reference into the conditions of sale of each ticket purchased. In this sense, a passenger must "misrepresent" his intended itinerary, impliedly stating as he purchases the ticket that he wishes to travel the entire spoke-hub-spoke route, but knowing that he instead will discard the tickets for travel to and from the point beyond his true destination. To this extent, then, the situation here is like the one presented in *Cement Manufacturers*, where contractors breached their contracts with cement manufacturers by representing that several different purchases of cement all were earmarked for use in a single project.

However, there are a number of ways in which the rubric of "fraud prevention" does not precisely carry over from *Cement Manufacturers* to this case. First, in *Cement Manufacturers*, the contractual limitation upon a contractor's purchase of cement—namely, that the cement must be used on a specific job—presumably was a *quid pro quo* for the manufacturer's agreement to "lock in" the maximum price for that purchase, with the manufacturer bearing the full risk of any intervening price increases. When a contractor violated this contractual limitation, purchasing cement that would not be used on the job specified in the contract, the contractor received something *more* than the bargained-for benefit, thereby disrupting the seemingly settled expectations of *both* contracting parties. It can be assumed, moreover, that the contractor was aware that "padded" purchases were contrary to the business arrangement as established and agreed to by the parties. Under these circumstances, there was no question as to the unlawful nature of the contractor's conduct in representing that each of several purchases of cement was intended for use in the same project.

This case, in contrast, involves the unilateral imposition by the Airlines of an additional condition of sale—a condition of which, it seems fair to say, many passengers are not even aware. Although Defendants suggest that a passenger's knowledge of the airlines' tariff rules is irrelevant, the very case they cite confirms that fraud requires a misrepresentation that is "calculated or intended to deceive" the injured party. *VanDenBroeck v. CommonPoint Mortgage Co.*, 210 F.3d 696, 701 (6th Cir.2000). Package discount pricing is commonplace in many industries—children's meals at fast food restaurants and automobile luxury packages are two examples that come to mind—and the average consumer presumably would not perceive that his purchase of such a package would

serve as an implied "representation" that he intends to use each and every part of that package, much less that he might be accused of fraud or deception if he chooses to discard a particular portion. While the Airlines surely would prefer to know in advance whether a passenger intends to travel on each segment for which he purchased a ticket—so that, for instance, they can sell tickets for any unused seats, and can plan their operations based on a more accurate count of passengers—their business objectives do not automatically trigger a passenger's duty to disclose his true itinerary, nor do they transform his silence on the subject into an "intent to deceive." In short, the question of "fraud" here involves a fact-intensive inquiry of a sort that was not needed in *Cement Manufacturers.*[18]

Of course, a duty to disclose *may* be imposed by contract, and this arguably is what the Airlines have done. Even so, however, the situation here is different from the one presented in *Cement Manufacturers*, where, as noted, the contractors received a benefit in exchange for their agreement to a limiting contractual term. Here, the tariff rules incident to a passenger ticket are not the subject of negotiations, but instead are presented to the passenger on a take-it-or-leave-it basis, almost as in a contract of adhesion. It cannot be said here, as it could in *Cement Manufacturers*, that a contracting party expressly and knowingly agreed to a limiting condition in exchange for a particular benefit, and then, having received the benefit, refused to adhere to the condition. In addition, even accepting the enforceability of the Airlines' hidden-city prohibitions as a matter of contract law, it is well established that the breach of a contractual obligation cannot support a claim of fraud. *See, e.g., Brock v. Consolidated Biomedical Lab.*, 817 F.2d 24, 25–26 (6th Cir.1987).

18. Indeed, Plaintiffs point to evidence that the airlines have not always treated the practice of hidden-city ticketing as "fraud," but that, to the contrary, some airlines publicly encouraged the practice in the past, and taught travel agents how to write such tickets at industry seminars. It would be difficult to establish the requisite "intent to deceive" where the purportedly injured party has propagated different views of what it considers "deception."

More importantly, Defendants' appeal to "fraud prevention" begs one of the central questions in this case—namely, whether the Airlines' prohibition on hidden-city ticketing is an anticompetitive practice that violates the Sherman Act. In *Cement Manufacturers*, there was no claim that the underlying industry practice of using specific job contracts was itself anticompetitive, or that any manufacturer's use of this practice was the product of concerted action. Moreover, the Government did not challenge the right of each individual manufacturer to adopt measures to enforce the terms of its own specific job contracts; indeed, the Government presumably would not have challenged even a *concerted* enforcement effort, but for its claim that "uniformity of prices and limitation of production [we]re necessary results" of this joint endeavor. *Cement Mfrs.*, 268 U.S. at 592, 45 S.Ct. at 587. In rejecting the Government's claim, the Court found that the only price and production effects that had resulted from the defendants' collective information-gathering effort were those that "would naturally flow from the dissemination of that information in the trade and its natural influence on individual action." 268 U.S. at 606, 45 S.Ct. at 592.

Here, by contrast, Plaintiffs' § 2 claim expressly challenges the lawfulness of each Airline's individual prohibition on hidden-city ticketing, alleging that this represents the anticompetitive exercise of each Defendant's alleged monopoly power, with an attendant impact upon the price of travel to or from Defendants' hub airports. Clearly, an individual Airline could not immunize itself from Sherman Act liability merely by characterizing the prohibited practice as "fraudulent" and enacting rules to prevent it. Just as clearly, § 1 would forbid any collective effort by Defendants to prohibit a practice that each could not lawfully proscribe on its own.[19] Thus, while *Cement Manufacturers*

19. Notably, the converse is not necessarily true—*i.e.*, even if one Airline could act unilaterally against hidden-city ticketing, it does not necessarily follow that the Airlines collectively could agree to do so.

did not address the propriety of an industry practice, but only the collective means of its enforcement, the present case implicates both questions, and the two are intertwined. The success of Defendants' appeal to "fraud prevention," then, necessarily depends to a degree upon their success in defeating Plaintiffs' § 2 claims, and factual issues as to the latter—a question addressed below—would preclude summary judgment as to the former.

More generally, Defendants' "fraud prevention" argument misconceives the nature of Plaintiffs' complaint about the Airlines' prohibition on hidden-city ticketing. Plaintiffs do not claim any "entitlement" to purchase hidden-city tickets, but presumably would be pleased to purchase tickets reflecting their actual hub-spoke itineraries, so long as the price of these tickets did not include a hub "premium" imposed as a product of an Airline's alleged monopoly power. Likewise, Plaintiffs presumably would not balk at disclosing their true hub-spoke travel plans to the Airlines, provided that they were required to pay only the discounted price that reflected any hidden-city savings opportunity. Indeed, according to Plaintiffs' experts, if Defendants are enjoined from enforcing their prohibitions on hidden-city ticketing, the Airlines' eventual response will be to lower their hub-spoke fares, thereby defeating their passengers' incentive to "misrepresent" their itineraries in order to obtain a cheaper hidden-city fare. In sum, while misrepresentation was the lynchpin of the scheme employed by the contractors in *Cement Manufacturers,* and the means through which they sought to avoid paying the prevailing market price in effect at the time they actually needed additional cement, the species of "fraud" practiced by airline customers in this case is not an essential prerequisite to the achievement of the fare structure sought by Plaintiffs, but is only a byproduct of these customers' "self-help" efforts to circumvent an allegedly unlawful pricing scheme imposed by the Airlines.

In any event, even accepting Defendants' characterization of hidden-city ticketing as "fraud," the Court still would find that the rule of *Cement Manufacturers* does not ap-

ply here, at least not as a matter of law. In *Cement Manufacturers,* the Supreme Court observed that the defendants' collective effort to gather and disseminate information about specific job contracts *"enable[d] sellers* to prevent the perpetration of a fraud upon them." *Cement Mfrs.,* 268 U.S. at 603–04, 45 S.Ct. at 591 (emphasis added). Absent this sharing of information, it would have been far more difficult, if not impossible, for any individual manufacturer to uncover a contractor's "padded" purchase of excess cement, beyond the amount needed to complete a specific project. Thus, *Cement Manufacturers* stands only for the limited proposition that the Sherman Act does not prohibit "the procuring and dissemination of information *which tends to prevent the procuring of fraudulent contracts."* 268 U.S. at 604, 45 S.Ct. at 591 (emphasis added); *see also United States v. Container Corp. of America,* 393 U.S. 333, 335, 89 S.Ct. 510, 511, 21 L.Ed.2d 526 (1969) (explaining that *Cement Manufacturers* allowed the exchange of price information among competitors "as a means of protecting their legal rights from fraudulent inducements to deliver more cement than needed for a specific job").

Defendants can advance no such justification for any concerted efforts in this case. To the contrary, as part of a different challenge to Plaintiffs' § 1 claim, discussed in detail below, Defendants assert that each individual Airline has its own independent business reasons for prohibiting hidden-city ticketing. As proof of this point, Defendants offer evidence that each Airline separately adopted its prohibition at a different time and in a different form, and that each has taken a different approach to enforcing its separate prohibition. This argument belies the proposition that collective action "enabled" the Airlines to uncover and prevent any instances of hidden-city ticketing. Similarly, nothing in the record suggests that the Airlines must collectively gather or share information in order to enforce their respective prohibitions; rather, the practice of hidden-city ticketing involves only a single Airline, and any individual occurrence of the practice presumably may be uncovered solely by resort to information in the possession of the "defrauded" Airline. (*See* Defendants'

Reply Br. at 12 n. 16 ("[Hidden-city] ticketing implicates only the fares of the airline being subjected to the misrepresentation.").)[20] In fact, the record indicates that Defendants *have* been able to unilaterally detect and penalize individual instances of hidden-city ticketing, through such countermeasures as cancellation of the remainder of a ticket when a passenger fails to travel one of its segments, and rules prohibiting the retrieval of checked baggage at the midpoint of a spoke-hub-spoke route. Consequently, *Cement Manufacturers'* "rule of necessity" has no application here.

Finally, Plaintiffs' § 1 claim goes beyond the mere sharing of information, and charges that Defendants agreed to a concerted course of action. The Court in *Cement Manufacturers* was careful to point out that the manufacturers had *not* reached any agreement or understanding as to the *use* they would make of the information they had gathered, but instead remained "free to act upon [it] or not as they cho[ ]se." *Cement Mfrs.*, 268 U.S. at 603–04, 45 S.Ct. at 591. In the present case, if the evidence shows only that Defendants collectively discussed the issue of hidden-city ticketing and shared information as to their respective prohibitions on the practice, but that they did not agree on a concerted policy or course of conduct with regard to this practice, Plaintiffs' § 1 claim will fail under the authority of *Maple Flooring*. And, in fact, this is the next of Defendants' challenges to the Section 1 claim in this case—namely, that the evidentiary record does not give rise to a reasonable inference of collusive action. Accordingly, having rejected Defendants' claim that the "fraud prevention" rule of *Cement Manufacturers* precludes their liability as a matter of law, the Court now turns to this next challenge.

## 2. Plaintiffs Have Produced Sufficient Evidence of Concerted Action to Withstand Summary Judgment on Their Section 1 Claim.

As noted earlier, the courts have adopted fairly stringent standards for assessing claimed violations of § 1 of the Sherman Act. The *Matsushita* Court explained:

> [A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.*, at 764, 104 S.Ct., at 1470. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. 465 U.S., at 764, 104 S.Ct., at 1471. [The plaintiffs] in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [the plaintiffs].

*Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356–57. The Court also cautioned that "mistaken inferences" can be "especially costly" in antitrust cases, because they threaten to "chill the very conduct the antitrust laws are designed to protect." 475 U.S. at 594, 106 S.Ct. at 1360.

 Following *Monsanto* and *Matsushita*, the Sixth Circuit has adopted a two-step inquiry for resolving a motion for summary judgment on a antitrust conspiracy claim. *See Riverview Investments, Inc. v. Ottawa Community Improvement Corp.*, 899 F.2d 474, 483 (6th Cir.), *cert. denied*, 498 U.S. 855, 111 S.Ct. 151, 112 L.Ed.2d 117 (1990). First, the Court must ask whether Plaintiffs' evidence of conspiracy is "ambiguous," meaning that it is "as consistent with the defendants' permissible independent interests as with an illegal conspiracy." 899 F.2d at 483. If so, the Court then must consider whether there is "any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests." 899 F.2d at 483. "A plaintiff thus fails to demon-

---

**20.** By way of contrast, the practice of "back-to-back" ticketing might require cooperative preventative measures, because the two tickets purchased to accomplish this result can be from two different airlines, so long as both fly between the passenger's point of origin and destination.

strate a conspiracy if, using ambiguous evidence, the inference of a conspiracy is less than or equal to an inference of independent action." 899 F.2d at 483; *see also Blomkest Fertilizer, Inc. v. Potash Corp.*, 203 F.3d 1028, 1032 (8th Cir.2000) ("[I]f it is as reasonable to infer from the evidence a price-fixing conspiracy as it is to infer permissible activity, then the plaintiff's claim, without more, fails on summary judgment."), *cert. denied*, 531 U.S. 815, 121 S.Ct. 50, 148 L.Ed.2d 19 (2000). Moreover, "a litigant may not proceed by first assuming a conspiracy, and then explaining the evidence accordingly." *Blomkest Fertilizer*, 203 F.3d at 1033.

■ In their present motion, Defendants argue that Plaintiffs' evidence fails this test, as it is ambiguous and is just as consistent with an inference of independent action as with an inference of conspiracy. Principally, Defendants contend (i) that each Defendant Airline has an independent business interest in prohibiting hidden-city ticketing; (ii) that the record reflects disparate adoption of hidden-city prohibitions by each Airline and disparate enforcement of these measures, thereby undermining any inference of concerted action; and (iii) that Plaintiffs' evidence of discussions among airline representatives about hidden-city ticketing is insufficient as a matter of law to establish a § 1 violation, absent further evidence of an agreed-upon course of conduct. Upon reviewing the record in light of Defendants' assertions, the Court finds that Plaintiffs' evidence of a § 1 conspiracy, while considerably short of overwhelming, would nevertheless permit a reasonable inference of collusive action.

It must be acknowledged, at the outset, that Plaintiffs have not produced any "smoking gun" evidence of an antitrust conspiracy. In *Cement Manufacturers*, for example, there was no doubt as to the existence of concerted action in gathering and disseminating information about specific job contracts; indeed, the constitution of the defendant trade association expressly called for this activity. Here, by contrast, there is no express agreement, in any form, as to a common course of action with regard to the practice of hidden-city ticketing. To the contrary, the initial impression upon surveying

the record is one of independent action; the Airlines adopted their respective prohibitions on hidden-city ticketing at various times over a several-year period, and Plaintiffs do not contend that Defendants uniformly enforced these prohibitions through the same or similar measures or to the same or similar extents. In fact, as Defendants point out, Plaintiffs' evolving theory of the unlawful conspiracy in this case now includes the apparent concession that each Airline remained "free to prevent hidden-city ticketing" in "whatever manner or degree it saw fit." (Plaintiffs' Motion for Class Cert., Br. in Support at 4.) Plainly, there can be no conspiracy where each supposed participant is free to act in any way it chooses.

Next, as Defendants contend, and as evidenced by the fact that each of the Defendant Airlines had adopted tariff rules against hidden-city ticketing at some point (often years) *before* the commencement of the alleged conspiracy, each Airline arguably has an independent business interest in prohibiting this practice. This weakens any inference of conspiracy that might otherwise arise from uniformities or parallelisms in Defendants' conduct with respect to hidden-city ticketing, because Defendants' parallel approaches to proscribing the practice might just as well be the product of independent business decisions as of deliberate collusion. *See Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1168 (6th Cir.1995) (observing that parallel conduct, "without more, does not itself establish a violation of the Sherman Act"), *cert. denied*, 516 U.S. 1047, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996); *Blomkest Fertilizer*, 203 F.3d at 1032–33 (noting that the same is true even with conscious parallelism).

Yet, upon closer inspection, Defendants' evidence of independent interests and actions is more equivocal than they would have the Court believe. First, Defendants sweep too broadly in their claim that each airline is indifferent to the hidden-city ticketing policies of other airlines, and is wholly free to adopt (or not) a prohibition on this practice by reference solely to its own independent business interests, and without fear of competitive losses to another airline. Even Defendants concede, in their reply brief, that

this analysis does not necessarily continue to hold true for routes between two carriers' hub airports. (*See* Defendants' Reply Br. at 12.)[21] Similarly, Northwest's former Chief Accounting Officer, Mark Osterberg, pointed out that hub airports shared by two carriers give rise to different competitive considerations:

> Let's take Dallas. Let's suppose in Dallas, Delta elects to enforce hidden-city ticketing and American elects not to. They are both hub carriers in Dallas. If I want to do hidden-city ticketing and I'm a customer, I'm a passenger, I'm going to go on the carrier that's not going to enforce it.

(Plaintiffs' Exhibits, Tab 95, Osterberg Dep. at 113.)

Thus, the relevant question, in terms of an airline's economic self-interest, would seem to be whether the financial gains from unilaterally enforcing a hidden-city prohibition on all hub-spoke routes would exceed the anticipated losses on hub-to-hub routes and at shared hubs if the airline's competitors chose *not* to prohibit hidden-city ticketing.[22] Neither side's argument and evidence on this point is particularly compelling. Defendants note that only 12 of the 234 routes at issue in this case involve the hubs of two different carriers, and they surmise that losses on 12 routes could not possibly outweigh gains on 222 others. This "numbers game" loses much of its persuasive force, however, when it is recalled that the gains on the 222 routes are confined to the *difference* between the hub-spoke fare and the encompassing hidden-city fare, while the losses on the remaining 12 routes consist of the *entire fare* that otherwise would have been collected from each passenger who gives his business to the competing carrier with no hidden-city prohibition.[23]

Plaintiffs' evidence, likewise, is either inconclusive or rests upon questionable assumptions. Although they cite various testimony and memoranda evincing the Airlines' recognition of the potential competitive risks involved in unilateral action against hidden-city ticketing, Defendants point to other materials in the record reflecting the Airlines' ultimate conclusion that such risks were relatively modest and worth taking.[24] Plaintiffs also cite the calculations of their expert, Dr. John Beyer, which indicate that each Airline's gain in revenue as a result of its hidden-city prohibition is dwarfed by the revenues achieved by that Airline on hub-to-hub

---

21. Interestingly, by distinguishing between hub-to-hub and other routes, Defendants seemingly have accepted the premise that each Airline is largely free to act as it pleases on hub-spoke routes involving its own hubs, without any concern about potential competition from other airlines. Yet, in their challenge to Plaintiffs' § 2 claim, Defendants deny that they have such competitive control on routes involving their hubs.

22. This assumes an "all-or-nothing" approach to the prevention of hidden-city ticketing. Both Plaintiffs and Defendants seem to operate under this assumption, and the Airlines' tariff rules include such a blanket proscription. Apart from technical difficulties in implementation, however, there would seem to be no reason why an airline could not choose to prohibit hidden-city ticketing on hub-spoke routes, but allow it on routes between its and another carrier's hubs. And, so long as airlines are free to make this choice, this option seemingly would have to be factored into any determination of an airline's economically "optimal" response to the practice of hidden-city ticketing.

23. In addition, Defendants chide Plaintiffs for their "failure to offer evidence that any of the three defendant airlines ever weighed its poten-

tial common hub-hub revenue losses against its total [hidden-city] losses." (Defendants' Reply Br. at 15.) This lack of evidence, however, strikes the Court as the proverbial "dog that didn't bark." According to Defendants, each Airline independently concluded that its own self-interest favored a prohibition on hidden-city ticketing, and that competitive concerns did not dictate otherwise. (*See id.* at 13, 15.) To reach such a conclusion, each Airline presumably would have needed to perform some sort of cost/benefit analysis, under the assumption that the Airline might lose at least some of its customers to competitors that elected not to adopt such a prohibition. Yet, if each Airline were confident that the other Airlines would *also* prohibit this practice, no such analysis would be necessary. As noted, there is no evidence in the record of any such analysis having been undertaken.

24. Moreover, while Plaintiffs offer evidence that the airlines reached a different conclusion regarding back-to-back ticketing, determining that unilateral efforts would not be effective and that group concurrence was needed, Defendants correctly observe that back-to-back ticketing is not at issue in this case, and that hidden-city and back-to-back ticketing raise wholly different competitive concerns.

routes.[25] Yet, it cannot be assumed that an Airline would lose *all* of its hub-to-hub revenue if it continued to prohibit hidden-city ticketing while its competitors did not, and Plaintiffs have not suggested any basis for determining what percentage of this revenue might be at risk. Nonetheless, the Court cannot accept Defendants' contention that this questionable assumption deprives Plaintiffs' position of all its weight. Rather, even if it were assumed, say, that an Airline faced only a 20–percent reduction in hub-hub revenue as a result of its unilateral stance against hidden-city ticketing, this loss still would exceed the gain posited by Dr. Beyer as a result of that Airline's enforcement of its prohibition. In short, questions of fact remain on the issue of each Airline's individual business interest in adopting a unilateral prohibition against hidden-city ticketing.

Next, the Court cannot concur in the dispositive weight Defendants would give to the evidence of each Airline's separate adoption and disparate enforcement of its tariff rules against hidden-city ticketing. As an initial matter, the evidentiary impact of the written rules against hidden-city ticketing is greatly diminished by the Airlines' apparent willingness, at some points in the past, to overlook—and, indeed, even to encourage—violations of these rules. In particular, Plaintiffs have produced fairly extensive evidence that several airlines, including those which had already adopted tariff rules against hidden-city ticketing, at least tolerated the practice through the late 1980's, and occasionally even promoted it. This evidence includes, for example: (i) testimony by Barbara Amster, a former Vice President of Pricing and Yield Management for American Airlines, as to her belief in 1989 that hidden-city ticketing—which, incidentally, she did not view as fraud—was a product of fare anomalies that the airline would "have to live with," (Plaintiffs' Exhibits, Tab 72, Amster Dep. at 26–28, 36, 39); (ii) a 1988 edition of an Industry Agents' Handbook put out by the Airlines Reporting Corporation, which instructs travel agents in writing "point beyond" and "more distant point" tickets, (Plaintiffs' Exhibits, Tab 3, Industry Agents' Handbook at 11, 13); (iii) the affidavit of a former airline employee, Bruce Bishins, stating that he "used to work for the airlines teaching travel agents how to write" hidden-city and point-beyond tickets, (Plaintiffs' Exhibits, Tab 3, Bishins Aff. at ¶ 12); and (iv) various news articles quoting airline officials as stating that there was little or nothing that they could do about the practice, or that hidden-city fares were merely loopholes that the airline was not concerned with closing, (*see generally* Plaintiffs' Exhibits, Tab 4). Plainly, a tariff rule says little about an Airline's independent policy against hidden-city ticketing if the rule is not enforced.

More generally, Defendants' challenge to Plaintiffs' evidence of collusive action seems to rest on a questionable premise—namely, that a conspiracy cannot be established absent a complete "sea change" in each Airline's practices that results in a lock-step approach to hidden-city-ticketing. As readily as an Airline *adopts* a policy toward hidden-city ticketing, it can just as readily *change* it—as, indeed, is evidenced by the record of the Airlines' periodic amendments to their respective tariff rules. Thus, even if an Airline already had adopted a tariff rule against hidden-city ticketing prior to the onset of the conspiracy alleged by Plaintiffs, this would not preclude the conclusion that this Airline nevertheless joined the conspiracy, and thereby agreed to *retain* its prior prohibition on hidden-city ticketing, or to enforce a previously dormant tariff rule. While it might well be more difficult to prove a conspiracy that involves only subtle changes in the conduct of its constituent members—and although, as discussed earlier, a given member's prior adoption of the supposed object of the conspiracy is strong evidence that this member's actions were independently motivated, and not the product of collusion—Defendants' evidence of prior prohibitions does not alone establish, as a matter of law, that the Airlines could not have conspired to

---

**25.** For example, according to Dr. Beyer, Defendant Northwest realized additional revenues of approximately $534 million in the period from 1992 to 1999 as a result of its hidden-city prohibition, but collected revenues of approximately $3.02 billion in that same time period from business passengers traveling on hub-to-hub routes.

deter the practice of hidden-city ticketing. Nor is Plaintiffs' claim of conspiracy fatally undermined by minor variances in the particular means of enforcement chosen by each individual Airline—an agreement need not dictate every conceivable aspect of each conspirator's behavior in order to violate § 1.[26]

Nonetheless, to survive summary judgment, Plaintiffs still must offer sufficient evidence of an agreement to act collectively against hidden-city ticketing. In particular, beyond Plaintiffs' evidence of arguably parallel conduct—which, as noted, is far from conclusive, where the record reflects only general similarities in the actions taken by the various Airlines to deter hidden-city ticketing, and where Plaintiffs concede that each Airline remained free under the alleged conspiracy to oppose this practice in whatever manner and degree it saw fit—Plaintiffs must produce additional evidence, sometimes described as "plus factors," which would permit an inference of "a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *Wallace*, 55 F.3d at 1168 (internal quotations and citation omitted). The necessary "plus factors" can include "actions contrary to a defendant's economic self-interest, product uniformity, exchange of price information and opportunity to meet, and a common motive to conspire or a large number of communications." 55 F.3d at 1168 (citations omitted).

In an effort to make the requisite showing, Plaintiffs point to three ways in which the Defendant Airlines allegedly went beyond mere parallel but independent conduct, and instead chose to adopt a concerted course of action against the practice of hidden-city ticketing. First, Plaintiffs assert that the Airlines collectively adopted the position that hidden-city ticketing is a species of fraud. Next, Plaintiffs contend that industry meetings were used as forums, not merely to share information about their separate practices and experiences with regard to hidden-city ticketing, but to exhort each Airline to take further steps to deter the practice. Finally, Plaintiffs argue that the Airlines colluded to publicize their prohibitions on hidden-city ticketing and their ability and intention to enforce these rules. The Court will review each of these contentions in turn, with an eye toward determining whether each rests upon a tenable reading of the record and, if so, whether it serves as a "plus factor" that could sustain an inference of an unlawful conspiracy.

Regarding the Airlines' position that hidden-city ticketing is tantamount to "fraud," the Court notes that Plaintiffs' claim of concerted action on this point has an initial ring of plausibility under a broad view of the record. There is ample evidence that, in the late 1980's, the airlines largely looked the other way with regard to hidden-city ticketing, viewing it as a potential basis for competition, an inevitable byproduct of their fare structures, or, at worst, an undesired "loophole" that was not worth the effort to plug. Yet, the Defendant Airlines now have come around to the point where they not only uniformly maintain that the practice is fraudulent, but have made this contention the centerpiece of their present motion for summary judgment, devoting fully half of their brief to variations on the theory that the Airlines were entitled to act as they did in a legitimate effort to stamp out fraud. The single-mindedness with which Defendants pursue this argument is striking, where it seemingly would suffice to cite fraud prevention as one of a number of legally permissible grounds upon which an airline might elect to take action against hidden-city ticketing—to facilitate better yield management, for example, or to stem the loss of revenue. And, of course, Defendants cannot make such an appeal to "fraud prevention" absent a shared view that hidden-city ticketing is, in fact, a

---

26. In any event, the Court believes that Defendants have overstated the degree of variance in the Airlines' approaches to hidden-city ticketing. Counsel asserted at the November 14 hearing, for example, that Defendant Delta "is no longer enforcing" its hidden-city prohibition. (11/14/01 Hearing Tr. at 70.) Yet, it was quickly conceded that "everybody," including Delta, automatically cancels the remainder of a passenger's itinerary if the passenger fails to travel one of its segments. (*Id.* at 71.) As the Court observed at the hearing, this clearly is an enforcement mechanism that strongly discourages the purchase of hidden-city tickets.

fraudulent practice, and that it should be opposed on that basis.[27]

In addition, Plaintiffs have produced some evidence that the Airlines' views on this subject evolved as a result of direct discussions among their representatives at industry meetings. The record can be read to suggest, for instance, that the airlines' international association, IATA, gradually arrived at the view that the analogous international practice of "cross-border" ticketing was counteracted most effectively by treating it as fraudulent. A 1989 IATA statement on the topic acknowledged that cross-border ticketing "is not fraud in the strict sense of criminal activity," but instead represented "a prevalent form of revenue dilution" and a "potentially substantial threat to yield maximization." (Plaintiffs' Exhibits, Tab 12, Dep. Ex. 206.) Over time, however, this practice was increasingly discussed in the context of fraud prevention, and was identified as an appropriate target for working groups and task forces that dealt with matters of fraud. Plaintiffs also point to an excerpt of the minutes of the March 17, 1993 meeting of the Joint ATA/IATA North American Fraud Prevention Task Force, whose membership included Northwest and U.S. Airways:

> Concern was expressed at a number of manipulative practices carried out by ARC agents that were treated simply as tariff matters whereas it was a Member's belief that such practices were fraudulent in nature in that they contained elements of deception and dishonesty that were prejudicial to the airlines. Practices such as hidden-city ticketing ... were, in general, not categorized as fraud. Members agreed that there were indeed problems in this area and that there was a need for an increasing awareness of these practices as being fraudulent ....

(Plaintiffs' Exhibits, Tab 34, 3/17/93 Meeting Minutes at 6.) The Court finds that this evidence, among other materials in the record, could support an inference that the Airlines did not independently decide to treat hidden-city ticketing as fraud, but instead arrived at that conclusion as a "meeting of the minds" at industry gatherings.

The Court further concludes that this evidence serves as a "plus factor" which, if credited, would tend to exclude the possibility that the Airlines were acting independently. First, the labeling of hidden-city ticketing as fraud would tend to overcome any individual Airline's inclination to weigh the competitive advantages and disadvantages of allowing the practice, and would instead provide a common motive for all Airlines to take action against it. Indeed, the record is replete with statements of the need for an industry-wide effort to combat fraud; Plaintiffs quote, for example, an airline representative's statement at a 1998 IATA Revenue Protection Forum that "I see that there is absolutely NO competition among airlines as far as fraud prevention is concerned." (Plaintiffs' Exhibits, Tab 57, Dep. Ex. 130 at 3.)

In addition, this treatment of hidden-city ticketing as fraud arguably provided an opportunity for the Airlines to lawfully meet and communicate on the subject, whereas such discussions might have been more problematic if hidden-city ticketing were viewed as a competitive pricing issue. This distinction is effectively illustrated through Defendant Northwest's attempt in 1993 to enlist Defendant ARC in the effort to enforce the Airlines' hidden-city prohibitions. The record reflects Northwest's anticipation that ARC would cite antitrust concerns as a basis for resisting the Airline's proposal. Nevertheless, Northwest urged ARC to participate in the enforcement effort, stating that practices such as hidden-city and back-to-back ticketing "result in *theft*," and arguing that, while "each airline could individually enforce" its tariff rules, ARC's involvement "would likely *deter* violations." (Plaintiffs' Exhibits, Tab 34, Dep. Ex. 400 at ARC00124.) Northwest also provided a legal opinion to ARC, which stated that hidden-city ticketing "potentially amount[s] to fraud," and then ob-

---

**27.** Indeed, to obtain protection under the rule of *Cement Manufacturers,* Defendants arguably must go further, and establish that, to the extent that they shared information and communicated among themselves regarding hidden-city ticketing, they did so for the purpose of preventing fraud.

served that "ARC routinely takes action ... against [travel] agencies that ... engage in fraudulent practices." (Plaintiffs' Exhibits, Tab 34, Dep. Ex. 399 at ARC00317.)

More generally, the record is replete with evidence of occasions on which hidden-city ticketing was discussed at industry meetings in the guise of "fraud prevention." If this practice were viewed as a matter of tariff enforcement, some evidence suggests that such joint discussions might have raised antitrust concerns. Northwest's Michael Levine, for example, testified that the airlines' antitrust immunity at IATA meetings extended only to discussions of international pricing issues, and that "the discussion of domestic tariff abuse would not have been, in my judgment, immunized by and therefore would have been exposed in an IATA meeting." (Plaintiffs' Exhibits, Tab 90, Levine Dep. at 593.) Similarly, antitrust concerns have consistently been cited as a reason why ARC does not assist in the enforcement of the Airlines' tariff rules. For all of these reasons, then, the Court finds that the Airlines' consensus view of hidden-city ticketing as "fraud" is a "plus factor" that tends to exclude the possibility that the Airlines have independently elected to pursue similar policies of deterring hidden-city ticketing.

Plaintiffs' next suggested "plus factor"— the alleged exhortations at industry gatherings that airlines should do more to oppose hidden-city ticketing—dovetails somewhat with their first "plus factor." In particular, the Court already has noted the evidence in the record that industry group meetings often served as forums for urging industry cooperation in response to fraudulent practices. Plainly, to the extent that hidden-city ticketing was included within the ambit of such "fraudulent" practices, these meetings went beyond the mere sharing of information regarding hidden-city ticketing and possible means for detecting and preventing it, and instead featured express exhortations to act collectively. Defendants' counsel agreed at the November 14, 2001 hearing that such exhortations to act would take this case outside the *Maple Flooring* situation of permissible information sharing. (*See* 11/14/01 Hearing Tr. at 47–48.)

Moreover, separate from these industry exhortations against hidden-city ticketing as "fraud," Plaintiffs have produced evidence which suggests that the proactive discussions of "cross-border" ticketing at IATA meetings might have spilled over into the Airlines' views of hidden-city ticketing as a practice that also should be more aggressively targeted. There seems to be little doubt that IATA, through certain working groups and task forces, affirmatively recommended steps that airlines could take to deter the practice of cross-border ticketing. Yet, it appears that IATA and its subgroups did not always scrupulously observe the distinction between cross-border and hidden-city ticketing, so that it is not unreasonable to infer that recommendations as to the former practice might have affected the airlines' behavior with respect to the latter one. As an example, IATA's director of fraud prevention, Mark Hawes, evidently made the proposal that led to the formation of the Joint ATA/IATA North American Fraud Prevention Task Force, and this task force apparently brought IATA's knowledge and expertise on matters of tariff abuse to bear upon the domestic concern of hidden-city ticketing. In addition, Plaintiffs point to the testimony of United's head of corporate security, Ken Gilbart, that his Airline's more active stance against hidden-city ticketing stemmed from discussions of these sorts of "abusive practices" at IATA or ATA meetings, and from the statements of airlines at these forums that "we think this is a big problem." (Plaintiffs' Exhibits, Tab 82, Gilbart Dep. at 93.)

The Court finds that this evidence, viewed in a light most favorable to Plaintiffs, could support an inference of more than mere sharing of information, and that the activities and discussions at industry meetings could reasonably be construed as an instigating factor in the Airlines' arguably stepped-up efforts to deter hidden-city ticketing. First, it is somewhat striking that representatives of the Airlines found so many opportunities to at least "compare notes" on their responses to hidden-city ticketing where, as discussed earlier, cooperation among the Airlines was by no means necessary for any individual Airline to take effective action

against this practice. *Compare Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 527 (9th Cir.1987) (finding that meetings among competitors did not qualify as a "plus factor" because cooperation was "a necessary incident" to the practice challenged in that case). Indeed, the record suggests more than mere passing references to hidden-city ticketing on a few occasions, where task forces and working groups were convened to address this and other "fraudulent" practices.

Even less should it have been necessary for the Airlines to affirmatively *encourage* each other to act more aggressively against hidden-city ticketing, in light of Defendants' contention that it was in each Airline's economic self-interest to do so. Yet, there is evidence of such encouragement in the record. Indeed, Plaintiffs have produced evidence of at least two meetings—the March 17, 1993 session of the joint IATA/ATA task force on fraud prevention in North America, and the September 30, 1993 meeting of the ARC executive committee—at which an Airline's representative expressly advocated a common approach to the practice of hidden-city ticketing. Even if Plaintiffs have not been able to produce further "smoking gun" evidence that these proposals were explicitly adopted, the evidence of advocacy on this point tends to refute a claim of independent action, as it indicates that at least *some* Airline representatives viewed concerted action as superior to separate prohibitions. Plaintiffs need not conjure up a motive to conspire, where the Airlines themselves, or at least some of them, apparently perceived one.

Turning, finally, to Plaintiffs' claim of concerted efforts to publicize the Airlines' prohibitions against hidden-city ticketing, the Court finds that the evidence on this point does not serve as an additional "plus factor" in support of an inference of a common scheme to deter. Virtually all of the travel agent warning letters and Airline representative statements produced by Plaintiffs refer only to the individual Airline that issued them, and do not so much as hint at a collective decision to publicize the efforts against hidden-city ticketing. The lone exception is a statement at a travel agent conference, attributed to a Delta representative, warning that all of the airlines were adopting automated systems to audit tickets and detect practices such as hidden-city ticketing. Even this statement, however, does not necessarily suggest a concerted plan of action, but is just as consistent with independent, parallel decisions to implement automated auditing systems. Likewise, Plaintiffs' citation to the testimony of Paul Ruden, an official of the American Society of Travel Agents, that the airlines "have been, for the most part, unrelenting in their determination to continue enforcing their penalties" on hidden-city tickets, (Plaintiffs' Exhibits, Tab 97, Ruden Dep. at 96), says nothing about a collective enforcement effort. More generally, despite their claims to the contrary, none of Plaintiffs' evidence on this issue establishes any sort of clear "point of demarcation," before which the Airlines did not publicize their hidden-city prohibitions or issue warning letters regarding the practice, and after which they began to do so.

Nonetheless, the Court finds that the two "plus factors" put forward by Plaintiffs are sufficient to withstand a judgment against them as a matter of law on their § 1 claim. In light of the Airlines' apparent consensus that hidden-city ticketing is a species of "fraud," and given the evidence that the Airlines discussed the practice and occasionally encouraged greater diligence at their industry gatherings, the Court finds that the present record would permit a reasonable inference that the Airlines' efforts to deter hidden-city ticketing are attributable to a common scheme or meeting of the minds, and do not simply reflect separate, legitimate business judgments as to a prudent course of action.

### 3. Defendants Are Not Entitled to Summary Judgment under a "Rule of Reason" Analysis of Their Alleged Conduct.

Finally, even assuming that the Airlines' prohibitions against hidden-city ticketing reflect an agreement to oppose the practice, Defendants argue that their justifications for adopting these prohibitions would pass mus-

ter under a "Rule of Reason" analysis. The Court harbors substantial doubt, however, as to whether a full-scale Rule of Reason analysis is required under the circumstances presented here. Even if so, the present record does not permit the Court to declare the outcome of such an analysis as a matter of law.

In another recent case also involving airline policy—in that case, a policy regarding the use of baggage templates at Dulles Airport, in order to limit the size of carry-on baggage—the Fourth Circuit surveyed the three different levels of analysis that have been applied to determine whether an agreement among competitors, or a "horizontal restraint," violates § 1 of the Sherman Act:

In determining whether a plaintiff has proved that a horizontal agreement violates Section 1, the Supreme Court has authorized three methods of analysis: (1) *per se* analysis, for obviously anticompetitive restraints, (2) quick-look analysis, for those with some procompetitive justification, and (3) the full "rule of reason," for restraints whose net impact on competition is particularly difficult to determine. The boundaries between these levels of analysis are fluid; there is generally no categorical line to be drawn between restraints that give rise to an intuitively obvious inference of anticompetitive effect and those that call for more detailed treatment. Instead, the three methods are best viewed as a continuum, on which the amount and range of information needed to evaluate a restraint varies depending on how highly suspicious and how unique the restraint is. In all cases, however, the criterion to be used in judging the validity of a restraint on trade is its impact on competition.

The first approach, *per se* analysis, permits courts to make categorical judgments that certain practices, including price fixing, horizontal output restraints, and market-allocation agreements, are illegal *per se*. Practices suitable for *per se* analysis have been found over the years to be one[s] that would always or almost always tend to restrict competition and decrease output, and that are not designed to increase economic efficiency and render

markets more, rather than less, competitive. Such restrictions have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se* without any need to conduct a detailed study of the markets on which the restraints operate or the actual effect of those restraints on competition.

At the other end of the spectrum, if the reasonableness of a restraint cannot be determined without a thorough analysis of its net effects on competition in the relevant market, courts must apply a full rule-of-reason analysis. In such cases a plaintiff must prove what market ... was restrained and that the defendants played a significant role in the relevant market because [a]bsent this market power, any restraint on trade created by [a] defendant's action is unlikely to implicate Section 1. The required analysis varies by case and may extend to plenary market examination, covering the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed, as well as the availability of reasonable, less restrictive alternatives.

Sometimes, the anticompetitive impact of a restraint is clear from a quick look, as in a *per se* case, but procompetitive justifications for it also exist. Such intermediate cases may involve[ ] an industry in which horizontal restraints on competition are essential if the product is to be available at all, or in which a horizontal restraint otherwise plausibly increase[s] economic efficiency and renders markets more, rather than less, competitive. For these cases, abbreviated or "quick-look" analysis fills in the continuum between *per se* analysis and the full rule of reason.

*Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508–10 (4th Cir.2002) (internal quotations and citations omitted).

In *Continental*, a Dulles Airport management council, consisting of all airlines serving the airport, and defendant United, the primary carrier at Dulles, had instituted a policy of installing baggage templates at the airport's two security checkpoints, and requiring that all carry-on baggage must fit

through these templates.[28] Plaintiff Continental dissented from this decision, alleging that it deprived the airline of its ability to compete on the basis of its more liberal carry-on baggage policy. In particular, Continental had expanded the overhead bin storage on its fleet of aircraft, and had increased its gate-checking services, so that carry-on bags could be quickly checked at the gate if the space on board had been exhausted.

The District Court applied a quick-look Rule of Reason analysis to this policy, and concluded that the defendants' procompetitive justifications were wanting as a matter of law. See Continental Airlines, Inc. v. United Air Lines, Inc., 126 F.Supp.2d 962, 974–81 (E.D.Va.2001). The lower court reasoned that a full Rule of Reason analysis was not necessary, where the baggage template policy "amount[s] to an agreement to provide a lower quality product and hence counts as an output restriction," in that it "standardizes, and thereby eliminates open competition on, an element of the bargain between carriers and passengers." 126 F.Supp.2d at 975. "In this regard, it is elementary economics that insofar as defendants' restriction standardizes an element of competition and prevents airlines like Continental from offering a better product and superior service to consumers with regard to carry-on baggage capacity and policies, the economic effect of the restriction is no different from the effect of a horizontal agreement among competitor airlines to fix the price of air carriage service for consumers." 126 F.Supp.2d at 975–76. The District Court also found, however, that something more than per se analysis was required, because the airlines "operate out of shared airport facilities and thus must form agreements from time to time concerning the use of these facilities," and because "[s]ome agreements of this sort may further procompetitive goals." 126 F.Supp.2d at 977. The Court then rejected the defendants' three proffered procompetitive justifications—improved on-time performance, enhanced onboard safety, and improved passenger comfort and convenience—and awarded summary judgment in favor of Continental.

The Fourth Circuit reversed, and remanded the matter to the District Court for further assessment of the baggage template policy under a more fully developed record. In so ruling, the Court observed that the unique architectural configuration at Dulles—a "bottleneck" facility with two common security checkpoints, and with past experience indicating that these two checkpoints could not vary in their treatment of carry-on baggage—"force[s] all of its airlines to cooperate on a single decision as to the use of templates." Continental, 277 F.3d at 512. "When the economic implications of physical or geographical limitations require coordination among competitors, the Supreme Court has long applied Section 1 of the Sherman Act with flexibility." 277 F.3d at 512–13. The Court further reasoned:

> Moreover, beyond the general need for greater cooperation at Dulles than at other airports, United and Continental each make a more specific claim, related to Dulles's unique configuration, as to why their respective preferred outcomes benefit competition. Each argues that only a uniform policy in accordance with its preference will make possible an entire service that would not otherwise be available at Dulles: assertedly, Continental must win to offer flights with carry-on largesse, and United must win to offer flights with carry-on rigor. The district court may ultimately have to choose between two procompetitive claims; either outcome would both help and hurt competition, and which helps competition more than the other may be far from plain.

277 F.3d at 513.

Under these circumstances, the Fourth Circuit found that additional analysis was necessary "to determine the nature of the challenged restraint's net effect on competition." 277 F.3d at 513. The Court also held that the lower court had erred in determin-

---

**28.** Each airline was given a supply of "medallions" that it could provide to select passengers—typically, first-class, business-class, and full coach fare passengers—whose baggage was then exempt from the template limitation.

ing that the defendants' procompetitive justifications were implausible as a matter of law. Accordingly, the case was remanded for further consideration of these issues under a more fully developed factual record. The Court did not decide, however, whether a modified quick-look analysis would suffice on remand, or whether a more extensive Rule of Reason analysis would be required to properly assess the lawfulness of the challenged restraint.

*Continental* provides valuable guidance in determining the proper level of analysis to apply in this case. In particular, by comparing that case to this one, the Court is fairly readily able to reject the extreme positions offered by the two sides here, and to conclude that the proper level of scrutiny lies somewhere in between *per se* and full-scale Rule of Reason analysis. Plaintiffs, not surprisingly, contend that the Airlines' alleged agreement to deter the practice of hidden-city ticketing is *per se* unlawful, as it prevents the alleged co-conspirators from competing on the basis of their hidden-city ticketing policies. Plaintiffs further maintain that this alleged agreement has a direct impact upon the prices paid by hub-spoke passengers for air travel, because it eliminates any opportunity for competition that might otherwise offer these passengers the option to purchase lower priced hidden-city tickets. Given these purportedly evident anticompetitive effects, Plaintiffs argue that *per se* analysis is appropriate.

In concluding otherwise, at least at this juncture, the Court acknowledges that Plaintiffs here, unlike the plaintiff in *Continental,* have not sought a ruling in their favor on this point as a matter of law. To the contrary, Plaintiffs are the non-movants here, and therefore are entitled to the benefit of all justifiable inferences. Nevertheless, it is instructive to identify the propositions that must be established in order to find that *per se* treatment is suitable here. First, of course, Defendants must have actually entered into the agreement alleged by Plain-

tiffs—in contrast, there was no doubt about the existence of such an agreement in *Continental.* Next, it must be determined that, in the absence of Defendants' alleged agreement, there would be increased competition as to hidden-city ticketing, with at least some airlines electing to permit the practice. This issue is disputed, with the Airlines asserting that each has an independent economic self-interest in prohibiting hidden-city ticketing.[29] Again, the situation was different in *Continental,* where the plaintiff airline was expressly seeking the opportunity to compete as to baggage policy, and undoubtedly would have done so if not for the defendants' contrary policy.

Third, and most importantly, Plaintiffs' appeal to *per se* analysis turns upon the hotly disputed issue as to what the Airlines would do in the "but-for" world where hidden-city ticketing was permitted, or where at least some Airlines were free to allow the practice. In order to find that an agreement regarding hidden-city ticketing is inherently anticompetitive, it must be evident that the competitive situation would improve in the absence of this restraint. Defendants argue otherwise, contending that the practice of hidden-city ticketing jeopardizes the optimal performance of the Airlines' hub-spoke networks, and offering expert opinion that the Airlines' likely response if they could not prohibit hidden-city ticketing would be to reduce or cease service on certain routes, and to raise certain spoke-spoke fares. In this sense, this case presents a situation like the one addressed in *Continental,* where the parties offer diametrically opposed visions as to whether the "but-for" world would feature a more or less competitive environment.

■ For many of the same reasons, however, the Court must reject Defendants' contentions that, as a matter of law, (i) a full Rule of Reason analysis is required here, and (ii) collective action against hidden-city ticketing passes muster under this analysis. Plainly, for purposes of deciding Defendants'

---

**29.** Indeed, there is an inherent tension between Plaintiffs' § 1 and § 2 claims on this point, where Plaintiffs have alleged, in support of their § 2 claims, that each Airline's hidden-city prohibition is an instrumental part of that Airline's own monopolistic strategy to impose "hub premiums" on its hub-spoke passengers. This seemingly would provide a motive—albeit an unlawful one—for each Airline to continue its prohibition, even in the absence of an agreement to do so.

motion, the Court must assume that the Airlines did, in fact, collectively agree to take action against the practice of hidden-city ticketing.[30] With this assumption in mind, the Court has no difficulty in identifying important distinctions between this case and *Continental,* and in concluding that these distinctions serve to illustrate why a more abbreviated analysis might be warranted here.

First and foremost, the need for cooperation that was a lynchpin of the Fourth Circuit's analysis in *Continental* is utterly absent here, at least under Defendants' view of the case. The Airlines flatly deny that they have any reason to act collectively with respect to hidden-city ticketing, and instead contend that each Airline has separately prohibited the practice on independent business grounds. On this point, the parties are largely in agreement, recognizing that hidden-city ticketing involves only a single airline's fares. Accordingly, because it is possible for one airline to choose to permit hidden-city ticketing while another elects to prohibit the practice, this case does not present the stark choice between two facially valid but mutually exclusive "all-or-nothing" policies that the Fourth Circuit confronted in *Continental.*

In light of the range of options that presumably would be available to each Airline here, absent their alleged agreement to adopt a uniform course of action, this case arguably involves a horizontal restraint on output, thereby warranting a less searching Rule of Reason analysis. Quite simply, even if a particular airline might deem it economically rational to prohibit hidden-city ticketing, it is difficult to see what is gained, from a competitive standpoint, by insisting that *all* airlines must do so. None of the various procompetitive justifications offered by Defendants in support of their hidden-city prohibitions would further serve to justify a joint effort against this practice. Rather, these justifications rest largely on the premise that, upon consideration of the myriad market forces on its various routes, each Airline has independently determined that, on balance, it is economically preferable to prohibit hidden-city ticketing than to allow it. This being the case, it would seem essential that each Airline remain free to make such a determination for each market in which it participates, something which plainly is not possible if the Airlines have agreed to a common, across-the-board policy.

Moreover, in the handful of situations where cooperative efforts might make a difference—shared hub airports, for example, or routes between one airline's hub and another's—it still is not evident what procompetitive benefits might flow from such cooperation. In any event, Defendants have not identified any. To the contrary, the Airlines state that they have never even considered allowing the practice of hidden-city ticketing on a limited basis or on particular routes, and so they presumably are in no position to identify the market benefits of such a limited policy.[31]

Accordingly, while Plaintiffs have not offered conclusive proof that the competitive climate would improve in the absence of an agreement to act against hidden-city ticketing, Defendants have even less to offer in support of the proposition that such an agreement is competition-enhancing. This suggests that it might not be necessary to conduct a painstaking market analysis to confirm the likely anticompetitive effect of the alleged restraint at issue here. Instead, a quick-look approach might be warranted, with the focus on Defendants' proffered procompetitive justifications for a blanket prohibition on hidden-city ticketing.

As noted elsewhere in this Opinion, as well as in the Court's separate Opinion addressing the admissibility of Plaintiffs' proposed expert testimony, a number of material factu-

**30.** Moreover, for the reasons discussed earlier, the Court does not find itself compelled as a matter of law to accept Defendants' "fraud prevention" justification for such an agreement.

**31.** Nor does the record cast light on any other available, less restrictive alternatives to a blanket prohibition against hidden-city ticketing. *Cf.*

*Continental,* 277 F.3d at 509 (noting that a full Rule of Reason analysis requires the examination of alternatives). An Airline might, for example, refuse to award frequent flier miles or withhold other perks where it detects that a passenger has used a hidden-city ticket.

al disputes stand in the way of any determination as to the validity of the Airlines' claimed justifications for their prohibitions against hidden-city ticketing. Most fundamentally, it has yet to be determined whether the Airlines' hidden-city prohibitions serve, at least in part, as a bulwark against competitive market forces that otherwise would threaten the "hub premiums" they allegedly have imposed on their hub-spoke passengers. In addition, the parties and their experts offer dramatically different visions as to the state of the "but-for" world where the practice of hidden-city ticketing would be permitted. In the face of such core issues of fact, it is hard to imagine how the Court could resolve a Rule of Reason inquiry, whether abbreviated or full-scale, as a matter of law one way or the other. *See Continental,* 277 F.3d at 511 ("Certainly courts have been wary of summary judgment in the context of quick-look analysis.").

In short, the present record does not dictate with any degree of certainty precisely what level of analysis should be applied, much less what the outcome of such an analysis would be. It follows that Defendants are not entitled to summary judgment in their favor on Plaintiffs' § 1 claim, and that the Court must await a full evidentiary record before deciding what sort of analysis should govern this claim.

## C. Plaintiffs' Section 2 Monopolization Claims

██ Defendants also seek summary judgment in their favor on Plaintiffs' § 2 claims against each individual Defendant Airline. Most of the grounds for Defendants' motion do not warrant extended discussion here, as they already have been addressed in the Court's prior ruling regarding the opinions of Plaintiffs' experts. These ·include: (i) that Plaintiffs have failed to establish that their 234 hub-spoke city-pairs are appropriate markets upon which to base § 2 monopolization claims; (ii) that Plaintiffs have not demonstrated the existence of monopoly power in each of these markets; and (iii) that Plaintiffs and their experts have drawn unwarranted inferences—both as to the existence and exercise of monopoly power, and as to

the existence and extent of damages suffered by members of the Plaintiff class—from the mere existence of some hidden-city savings opportunities for each hub-spoke market. Because the opinions of Plaintiffs' experts have been deemed admissible on these points, at least at the present juncture, this proffered expert testimony raises genuine issues of fact under the present record that preclude an award of summary judgment on these grounds. The battle of the parties' experts, in other words, must await resolution at trial.

██ This leaves only a single remaining argument in support of Defendants' motion— namely, that each Airline's prohibition against hidden-city ticketing has purely "intrabrand" effects which cannot support a claim under § 2. As explained in the Court's initial published Opinion in this case:

> In order to state a viable monopolization claim under § 2, an anti-trust plaintiff must allege: (1) the possession of monopoly power in the relevant market; and (2) the willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means. Section 2 requires both elements because the mere possession of monopoly power is not illegal.

*Chase,* 49 F.Supp.2d at 565 (internal quotations and citations omitted). Then, as now, Defendants challenged the second element of this standard, asserting that Plaintiffs had not identified any actionable anticompetitive conduct. The Court rejected this contention at the outset of this litigation, and finds an insufficient basis for concluding differently at this juncture.

Of course, given that the Court previously addressed this precise issue in these same proceedings, one might expect that Defendants would acknowledge the Court's prior ruling, but endeavor to show why it should no longer control upon the completion of discovery. Remarkably, Defendants did neither in their initial brief in support of their motion. Even when confronted with Plaintiffs' argument that this Court's prior decision should be deemed the "law of the case," Defendants offered in reply only the unremarkable observations that (i) the law of the case doctrine applies solely to issues actually

decided at an earlier stage of the proceedings, and (ii) that, in any event, the doctrine is discretionary, with the Court remaining free to reach a different conclusion. These propositions would carry considerably more force, however, if Defendants either (i) advanced a plausible argument, based on careful analysis, that the Court's prior ruling did not, in fact, address the present issue, or (ii) pointed to specific instances where Plaintiffs' allegations have not been borne out through discovery. Defendants have done neither. Nor have they otherwise persuaded the Court that its prior ruling or supporting analysis should be abandoned.

In so concluding, the Court necessarily begins its present analysis by reviewing its earlier decision. Admittedly, this survey would be brief indeed, and perhaps even unnecessary, if the Court were to accept Defendants' cramped understanding of the second, "anticompetitive conduct" element of a § 2 claim. In particular, Defendants apparently assert that conduct is anticompetitive only if it is overtly directed at rivals, and expressly designed to exclude these rivals from the relevant market. Defendants observe that a given Airline's hidden-city prohibition is not directly "exclusionary" in this sense, as it is not aimed at the Airline's competitors, but is intended first and foremost to preserve each Airline's own fare structure. Defendants then cite passages in the record in which Plaintiffs and their expert, Dr. Beyer, seemingly acknowledge this proposition. Finally, Defendants advance this view of the law and the record as justifying their disregard of the Court's prior ruling, which, according to Defendants, "d[id] not discuss or analyze what constitutes exclusionary conduct." (Defendants' Reply Br. at 23.)

In making this remarkable assertion, Defendants evidently failed to review the latter half of the Court's earlier Opinion, or perhaps thought it inconsequential to the present inquiry. The Court reads its decision far differently. For purposes of Defendants' initial motion to dismiss, the parties and the Court alike assumed that Plaintiffs had adequately alleged the first element of their § 2 claim, possession of monopoly power. Accordingly, the Court's *entire analysis* of Plaintiffs' § 2 claim was focused on the second element—*i.e.*, the anticompetitive exercise of this power, or "exclusionary" conduct as it is sometimes termed in antitrust law. *See Chase*, 49 F.Supp.2d at 565–69; *cf. Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482–83, 112 S.Ct. 2072, 2090–91, 119 L.Ed.2d 265 (1992) (speaking of this second element as variously requiring (i) "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor," (ii) the "willful acquisition or maintenance of monopoly power," or (iii) "exclusionary action" (internal quotations and citations omitted)).

In the event that Defendants did overlook this portion of the Court's earlier ruling, a brief recap is in order. In that decision, the Court held that Plaintiffs' allegations of anticompetitive conduct sufficed to state a viable § 2 claim. 49 F.Supp.2d at 568–69. In so ruling, the Court expressly acknowledged, and extensively addressed, Defendants' related contentions that "allegations of anti-competitive effects on intrabrand competition alone will not support a claim under § 2," and that Plaintiffs "must also allege some negative effect on interbrand competition resulting from" an Airline's hidden-city prohibition. 49 F.Supp.2d at 566.[32] The Court found otherwise, largely on the authority of the Eleventh Circuit's decision in *Graphic Products Distributors, Inc. v. Itek Corp.*, 717 F.2d 1560, 1571–76 (11th Cir.1983). In particular, the Court quoted with approval the following passage from *Itek:*

> The argument, pressed by [defendant] at length here, that the reduction or elimination of intrabrand competition is, by itself, never sufficient to show that a trade restraint is anticompetitive must rest, at bottom, on the view that intrabrand competi-

---

**32.** As explained in the earlier Opinion, "[i]nterbrand competition is the competition among the manufacturers of the same generic product," while "intrabrand competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer." *Chase*, 49 F.Supp.2d at 566 n. 20 (quoting *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 52 n. 19, 97 S.Ct. 2549, 2558 n. 19, 53 L.Ed.2d 568 (1977)).

tion—regardless of its circumstances—is never a significant source of consumer welfare. This view is simply not supported by economic analysis, or by the cases. A seller with considerable market power in the interbrand market—whether stemming from its dominant position in the market structure or from the successful differentiation of its products—will necessarily have some power over price. In that situation, intrabrand competition will be a significant source of consumer welfare because it alone can exert downward pressure on the retail price at which the good is sold.

*Chase,* 49 F.Supp.2d at 567 (quoting *Itek,* 717 F.2d at 1572 n. 20). Following *Itek,* this Court concluded that Plaintiffs' allegations of diminished intrabrand competition, combined with their allegations of a dominant market position in the relevant interbrand market, sufficed to state a claim under § 2. *See Chase,* 49 F.Supp.2d at 568–69.

Defendants' present argument is merely a restatement of the intrabrand/interbrand challenge mounted at the initial stage of this litigation. Now, as before, Defendants submit that each Airline's hidden-city prohibition affects only that Airline's own fare structure, and does not inhibit competition among the various Airlines in the relevant product market of passenger air travel service. As Defendants point out, there is nothing inherent in one Airline's refusal to sell a hidden-city ticket for hub-spoke travel that would prevent another Airline from offering competitive service on this hub-spoke route. Indeed, to the extent that hidden-city prohibitions result in higher fares, Defendants assert that these prohibitions are presumptively *procompetitive* in the interbrand market, as higher prices generally encourage entry into a market. Yet, all of this just as surely could have been (and was) said at the outset of these proceedings—which brings the Court to ask, once again, why it should deviate from its earlier conclusion that anticompetitive conduct directed at the intrabrand level alone can, in the proper circumstances, sustain a § 2 claim.

One possible ground for departing from this ruling, of course, would be the absence of evidence in support of Plaintiffs' § 2 allegations. Nothing in the course of discovery, however, has altered the parties' or the Court's basic understanding of the nature of hidden-city ticketing. Nor have Plaintiffs alleged some sort of anticompetitive or exclusionary conduct or impact that they are now unable to support through the materials produced in discovery. To the contrary, Plaintiffs' discovery responses, as cited in Defendants' motion, illustrate their consistent intrabrand-based theory of liability in this case:

> The exclusionary practices challenged in this case are not primarily directed at [Defendants'] airline competitors. Rather, Plaintiffs challenge Defendants' individual and collective interference with, and foreclosure of, the natural (intra-brand) price arbitrage that would occur as a result of the inherent pricing anomalies present in the airlines' present fare structure. In the absence of Defendants' conspiracy and monopolization, it is the travel agents/agencies who would "enter the market" to "compete" with Defendants, by actively publicizing and selling hidden-city, back-to-back and similar types of tickets .... While travel agents/agencies strive to provide the lowest possible air fare to their customers ..., they collectively have been prevented from providing such services to Plaintiffs and the putative class as a direct result of Defendants' conspiratorial and monopolistic rules, policies and practices.

(Defendants' Motion, Ex. 11, Plaintiffs' Interrogatory Responses at 48.) Plainly, to support this theory, Plaintiffs need not produce evidence of "exclusionary conduct" as Defendants would define that term.

Further, many of the purported "revelations" identified in Defendants' motion surely were evident to all throughout this litigation, and so provide no basis for reconsideration of the Court's prior ruling. Defendants state, for instance, that "exclusionary conduct" directed at travel agents cannot sustain Plaintiffs' § 2 claims, where travel agents and the Airlines do not compete in the relevant market of passenger air travel service. This point is rather obvious, however, and Defendants may rest assured that the Court made no contrary assumption in rendering its earli-

er decision. Likewise, Dr. Beyer's purported "concession" that he does not consider hidden-city prohibitions to be "exclusionary conduct," (*see* Beyer Dep. at 60), is wholly consistent with Plaintiffs' stated position that the unlawfulness of a hidden-city prohibition lies not in any direct purpose to exclude competitor airlines from hub-spoke markets, but in such a prohibition's tendency to impede the competitive forces that otherwise would operate to constrain fares for hub-spoke travel.[33]

Consequently, there being no apparent evidentiary shortfall that Defendants may seize upon to distinguish the Court's earlier ruling, Defendants are left to argue, in essence, that the Court wrongly denied their initial motion to dismiss. In considering this contention, the Court notes that the decisional law provides very little direct guidance on the question whether intrabrand conduct alone may support a § 2 claim. Indeed, the Court's earlier ruling rested principally on the authority of a single decision, *Itek*, and the subsequent case law has little to add on the subject. Nonetheless, upon surveying the limited case law on this and related issues, the Court adheres to its prior ruling.

In considering anew the nature of the Airlines' hidden-city prohibitions, the Court initially observes that they can best be characterized as "vertical restraints" which impose limitations upon the sale of passenger air travel services.[34] Absent these restraints, a hub-spoke passenger would be able to choose among hub-spoke and encompassing spoke-

hub-spoke fares in purchasing a ticket. Even if an Airline itself did not wish to publicize the availability of hidden-city fares or sell hidden-city tickets to its customers, a passenger could seek the assistance of a travel agency in identifying and purchasing such tickets. The record indicates that this has occurred in the past, with various airlines and Defendant ARC's handbook instructing travel agents how to write hidden-city tickets. Plaintiffs charge that the Airlines have largely eliminated this opportunity through their enforcement of vertical restraints against the purchase and use of hidden-city tickets.

Yet, the mere existence of such a vertical restraint, without more, cannot sustain a monopolization claim under § 2. "[A] manufacturer cannot be charged with antitrust violations if it monopolizes its own brand," *International Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 908 (6th Cir.1989), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1783, 108 L.Ed.2d 784 (1990), and "in many cases, a refusal to deal designed to accomplish vertical integration, without more, should not be a basis for imposing liability," *Byars v. Bluff City News Co.*, 609 F.2d 843, 861 (6th Cir.1979). Thus, even if an Airline altogether eliminated travel agents as an alternate source of ticket sales, such a vertical integration of the chain of distribution would not be *per se* unlawful; rather, the totality of the circumstances would have to be carefully examined to assess the possible anticompetitive effects of such a scheme.

---

**33.** In any event, to the extent that Dr. Beyer's testimony is viewed as expressing a legal conclusion as to what constitutes actionable "exclusionary conduct" under § 2, such an opinion cannot overcome the Court's duty to say what the law is.

**34.** As noted earlier, a horizontal restraint entails action by competitors at the same market level. In this case, for example, Plaintiffs' § 1 claim rests upon allegations of a horizontal agreement among the Airlines to deter the practice of hidden-city ticketing. In contrast, a vertical restraint operates in the distribution chain between supplier and customer—in this case, an Airline and its passengers. Given the vertical nature of an individual Airline's hidden-city prohibition, Defendants' protestations that the Airlines and travel agents do not compete in the relevant market—namely, passenger air travel service— are utterly unremarkable and lack legal signifi-

cance. Likewise, because Plaintiffs here are not "jilted distributors," and do not otherwise claim that they have been excluded from the relevant market, Defendants' various citations to antitrust cases in which a plaintiff failed to show that it competed with the defendant in a relevant market, *see, e.g., Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1353–55 (Fed.Cir.1999); *Ad–Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336, 1348 (11th Cir. 1987), are simply inapposite. Much as Defendants might prefer that Plaintiffs' § 2 claims rested on a fundamentally flawed view of the marketplace, Plaintiffs have stubbornly refused to cast their claims in such terms. Any legal defects in these claims lie well below the surface, and will not be disclosed through Defendants' superficial apples-to-oranges comparisons.

*See Byars,* 609 F.2d at 861–62; *see also Continental T.V.,* 433 U.S. at 51–57, 97 S.Ct. at 2558–61 (addressing the "complex" market impact of vertical restrictions). It follows that careful analysis also is required here, where something less than full-scale vertical integration is at issue: travel agents continue to sell tickets for air travel, but have been prohibited from writing hidden-city tickets.

Unfortunately, neither side has provided much assistance in this analysis. Plaintiffs are largely content to rest on the Court's prior ruling.[35] As noted, this reliance is well placed, where the Court's earlier decision squarely held that the market conditions alleged by Plaintiffs, if established, would sustain a § 2 claim based on purely intrabrand anticompetitive conduct. *See Chase,* 49 F.Supp.2d at 568–69. As indicated elsewhere in this Opinion, Plaintiffs have produced sufficient evidence of these market conditions to withstand summary judgment. In particular, Plaintiffs point to expert testimony and government studies suggesting that the Airlines possess dominant market strength on many routes to and from their respective hub airports, and that substantial barriers to entry exist at these hub airports.

The Court concludes, as it did before, that such market conditions can serve to tip the balance between the pro- and anti-competitive effects of a vertical restraint. Absent market power in the interbrand hub-spoke market, an Airline could not employ vertical restrictions as a means of driving up the fares for hub-spoke travel, because competitors could defeat this attempt by offering lower fares. *See Continental T.V.,* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19 ("[W]hen interbrand competition exists, ... it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product."); *Itek,* 717 F.2d

at 1568–69 & n. 11 (explicating this rationale for its "insist[ence], at the threshold, that a plaintiff attacking vertical restrictions establish the market power of the defendant"). Even with a substantial share of the hub-spoke market, but with low barriers to entry, an Airline could not achieve supracompetitive hub-spoke fares through vertical restraints, because higher fares would provide an incentive for competitors to enter the hub-spoke market.

If neither of these disciplining factors is present, however, an otherwise lawful vertical restriction can threaten consumer welfare, and is therefore subject to scrutiny as an anticompetitive measure forbidden by the Sherman Act. As observed in *Itek:*

> [I]n situations of manufacturer market power, intrabrand restrictions on distributor competition can have a substantial adverse effect on consumer welfare by eliminating an important source of competitive pressure on price. Rather than promoting nonprice competition, vertical restraints in this context may enable a manufacturer to retain monopoly profits arising from an interbrand competitive advantage.

*Itek,* 717 F.2d at 1572 n. 20; *see also Tunis Brothers Co. v. Ford Motor Co.,* 696 F.Supp. 1056, 1061 (E.D.Pa.1988) (recognizing that "a diminution in intrabrand competition in an oligopolistic market exercised by one with considerable market power" can produce anticompetitive effects that violate the Sherman Act). Plaintiffs here have produced evidence suggesting that the Airlines' dominant market shares and barriers to entry at their hub airports leave them largely free to impose supracompetitive fares on their hub-spoke routes, without having to account for competitive pressures that otherwise would keep prices in check. The Court again holds, as it did previously, that the vertical nature

---

**35.** Plaintiffs' only other argument on this point is that hidden-city prohibitions have interbrand as well as intrabrand effects, in light of the Airlines' alleged collective adoption of these prohibitions. Yet, this contention inappropriately elides the distinction between Plaintiffs' § 1 and § 2 claims. If there were such an agreement among the Airlines to prohibit hidden-city ticketing, then Plaintiffs' § 2 claims would be mere surplusage, as all of the relief they seek could be obtained

through their § 1 claim. If their § 2 claim adds anything, then, it can only be in the event that each Airline's separate hidden-city prohibition is found to be an anticompetitive exercise of its own alleged monopoly power, without regard for what the other Airlines might be doing with respect to this practice. For present purposes, then, the Court believes it appropriate to view each Airline's conduct in isolation.

of the mechanism through which the Airlines allegedly achieved this result does not shield Defendants from liability under § 2 of the Sherman Act.

By failing to acknowledge the import of the Court's prior ruling, Defendants have surrendered their opportunity to challenge its reasoning head-on. Nevertheless, they indirectly call into question one of the assumptions made in the Court's earlier decision—namely, that travel agents may be counted upon as a competitive force in the intrabrand market of ticket sales. Specifically, in a footnote in their brief, and at greater length at oral argument, Defendants have pointed to cases holding that it is not unlawful for a principal to insist upon the price that its agent charges for its product. *See, e.g., Ad–Vantage,* 849 F.2d at 1346; *Illinois Corporate Travel, Inc. v. American Airlines, Inc.,* 806 F.2d 722, 724–26 (7th Cir.1986). Indeed, in the latter of these cases, the District Court expressly found that "[a]s their title indicates, travel agencies are agents" of the airlines. *Illinois Corporate Travel v. American Airlines, Inc.,* 700 F.Supp. 1485, 1492 (N.D.Ill.1988), *aff'd,* 889 F.2d 751 (7th Cir.1989). "The implicit assumption behind [the principal/agent] cases is there can be no antitrust violation without a competitor, and agents do not compete with those whom they represent." *Ad–Vantage,* 849 F.2d at 1346. Moreover, Judge Posner has identified an economic rationale for this rule, observing that agents typically lack the information and expertise to make pricing decisions, so that they should not be consulted in determining what constitutes a "competitive" price for a product. *See Morrison v. Murray Biscuit Co.,* 797 F.2d 1430, 1437 (7th Cir.1986).

Applying these principles here, Defendants insist that travel agents do not truly compete with the Airlines in the market of ticket sales, because the agents are bound to adhere to the price and other terms and conditions dictated by the Airlines. Consequently, when an Airline raises its fares, a travel agency must pass this increase along to its customers, and does not engage in a "price-fixing conspiracy" by doing so. It follows, in Defendants' view, that an Airline may insist upon its travel agencies' allegiance to a hidden-city prohibition without violating the Sherman Act.

The Court finds Defendants' argument on this point illuminating, but not dispositive. First, as a matter of brute fact, it appears that travel agents have served in the past as a disciplining force against elevated hub-spoke fares. Specifically, while most of the airlines have long had tariff rules against hidden-city ticketing, some of them nevertheless have acquiesced, at least, in the sale of such tickets by travel agents. Regardless of whether this is viewed as "competition" within the meaning of the Sherman Act, it is clear that the Airlines' present enforcement of their hidden-city prohibitions has foreclosed this previously existing avenue of price relief. In this respect, then, Defendants' appeal to agency principles is weakened by their failure to scrupulously observe the rules that govern a typical principal/agent relationship.

The Court also notes that the principal/agent nature of a travel agency's relationship with a given Airline is complicated by the agency's corresponding obligations to its customers, including its duty to identify the lowest possible fare. If a travel agency fails to aggressively pursue low fares on behalf of its customers, it is likely to lose business to other agencies. In this respect, a travel agency's interests are not aligned with those of any specific Airline "principal," making it arguably capable of conspiring with or competing against this Airline. *See Morrison,* 797 F.2d at 1438 ("Some cases hold that if the agent is acting for his own purposes rather than those of the principal he may be capable of conspiring with the principal.").

Moreover, the agency rule cited by Defendants cannot be divorced from the legal context in which it was developed. In particular, this principle generally is invoked as a defense to a charge of unlawful conspiracy in violation of § 1 of the Sherman Act. *See, e.g., Illinois Corporate Travel,* 889 F.2d at 752; *Morrison,* 797 F.2d at 1431. In its most direct application, then, this agency rule would preclude only a § 1 claim that the Airlines had conspired with travel agents to eliminate the practice of hidden-city ticketing. Indeed, this Court relied on related agency principles in dismissing Plaintiffs'

claim of a § 1 conspiracy between Defendants Northwest and ARC to adopt and enforce a hidden-city prohibition. *See Chase,* 49 F.Supp.2d at 561–63. In contrast, under § 2, Plaintiffs need not identify a separate entity with which the Airlines are capable of conspiring. Further, even in the context of § 1, a vertical arrangement between a principal and agent is not always and invariably *per se* lawful, but generally is subject to assessment under the Rule of Reason. *See Illinois Corporate Travel,* 889 F.2d at 754, 806 F.2d at 727–29.

Nevertheless, the Court recognizes that it is somewhat problematic to rest a § 2 claim of anticompetitive conduct solely upon allegations of restrained "competition" between a principal and its agent, where such parties have, at best, only a limited capacity to compete. Here, for instance, it is not as though a discounted fare offered by a travel agent could be said to reflect an economic judgment by the agent as to the suitability of this fare. Likewise, when travel agents were permitted to write hidden-city tickets, they did not do so based on an assessment that the lower hidden-city fare was a proper or "competitive" price for hub-spoke travel; rather, agents wrote such tickets merely as the lowest-fare option for their customers to travel on the desired hub-spoke route.

There is nothing inherently anticompetitive, then, in the Airlines' withdrawal of the travel agents' prior authority to issue hidden-city tickets. If there were, one could just as readily argue that an Airline would violate § 2 by mistakenly propagating a discounted fare for one of its routes, and then discovering the error and removing the fare after travel agents had already issued some tickets at the too-low price. In either case, a source of fare discounting would be removed from the marketplace, but it could not be said that these discounts were the product of market competition. In this regard, Defendants make a persuasive case that an Airline's actions viz-a-viz travel agents provide a slender reed upon which to rest a showing of anticompetitive conduct.

Yet, the Court is unwilling, under the present record, to take the final step urged by Defendants—to accept the "mistaken fare" analogy *in toto,* and to deem it *per se* lawful for the Airlines to close the hidden-city "loophole" in their fare structures. The Court cannot escape the element of question-begging in Defendants' position. If, in fact, Defendants' hub-spoke fares are determined by competitive forces, then the Airlines do not act anticompetitively in foreclosing hidden-city fares that threaten their legitimate fare structures. If, on the other hand, Plaintiffs and their experts carry the day with their assertion that lower hidden-city fares are the product of supracompetitive hub premiums imposed by the Airlines on their hub-spoke passengers, then Plaintiffs seemingly would have established one of the hallmarks of monopoly power—namely, "the power to control prices," *Intergraph Corp.,* 195 F.3d at 1353—and the exercise of this power in the setting of hub-spoke fares. To close a "loophole" under these circumstances would foreclose the opportunity of consumers to obtain the competitive fares which, in Plaintiffs' view, are reflected in hidden-city tickets.

This is precisely the anticompetitive "intrabrand" effect accepted in the Court's prior ruling as sufficient to sustain a § 2 claim. In particular, the Court characterized Plaintiffs' § 2 claims as based on Defendants' creation of an "anti-competitive barrier" that "interferes with how the relevant market would operate in the absence of" the Airlines' hidden-city prohibitions. *Chase,* 49 F.Supp.2d at 566. While this earlier Opinion also spoke of reduced competition among the various distributors of tickets for air travel, *see Chase,* 49 F.Supp.2d at 569, the Court does not view the existence of such competition as the lynchpin of its ruling. If it were, this would mean that a fully vertically-integrated monopolist would be wholly immunized from § 2 liability for any actions it might take within its monopolized market that threaten consumer welfare. Such actions, after all, could not jeopardize intrabrand competition—by assumption, there is none. Moreover, in Defendants' view, any negative impact upon consumers must be deemed procompetitive in the interbrand market, as it enhances the opportunity for rivals to capture the business of disgruntled customers. Yet, this assumes that entry is

possible, and, as noted, Plaintiffs have introduced issues of fact on this question.

In any event, even leaving aside intrabrand considerations for the moment, the Court is not persuaded as a matter of law that an individual Airline's hidden-city prohibition has no conceivable anticompetitive effect in the interbrand market of passenger air travel service. Defendants simplistically argue that it cannot, because it merely results in increased prices in hub-spoke markets, thereby encouraging entry into these markets. This view is incomplete, however, as it ignores the barriers to entry identified by Plaintiffs, and overlooks the possible competitive benefits that might accrue to an Airline that is able to successfully impose supracompetitive hub premiums while maintaining its monopoly share of hub-spoke passengers. Under the present, summary judgment posture of this case, the Court must accept as true Plaintiffs' evidence and expert testimony that such competitive imperfections are present in the relevant hub-spoke markets.

In these circumstances, there is a potential for mischief in the interbrand marketplace. First, as suggested by Plaintiffs' counsel at the November 14 hearing, an Airline's supracompetitive pricing on its allegedly monopolized hub-spoke routes could operate to subsidize its pricing on its competitive spoke-spoke routes. Such a fare structure would raise the specter of monopoly leveraging. The Sixth Circuit has recognized that a plaintiff can make the requisite showing of anticompetitive conduct under § 2 by pointing to the defendant's exploitation of monopoly power in one market to gain a competitive advantage in another. *See Kerasotes Michigan Theatres, Inc. v. National Amusements,* *Inc.,* 854 F.2d 135, 137–38 (6th Cir.1988), *cert. denied,* 490 U.S. 1087, 109 S.Ct. 2461, 104 L.Ed.2d 982 (1989).[36]

Indeed, given the interdependent nature of an Airline's hub-spoke network, there is reason for concern that an Airline's monopoly leveraging on its spoke-spoke routes might also serve to further enhance its dominant position at its hub airport. In positing the state of the "but-for" world where Defendants could not prohibit hidden-city ticketing, Plaintiffs have pointed to evidence that changes in operations at one spoke of an Airline's hub-spoke network can produce a ripple effect throughout the network. If this can occur negatively, with a reduction in service at one or more spokes jeopardizing the profitability of the hub airport fed by those spokes, it stands to reason that the opposite could occur as well—that is, that increased service at "feeder" spokes could produce a thriving hub. In this way, an Airline's leveraging of its alleged hub monopoly to enhance its position on spoke-spoke routes could, in turn, redound to the benefit of its alleged market dominance at its hub airport. If so, such conduct could be deemed anticompetitive under § 2, as it would signify the willful maintenance of monopoly power (and supracompetitive pricing) at an Airline's hub, "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Re/Max International, Inc. v. Realty One, Inc.,* 173 F.3d 995, 1016 (6th Cir.1999) (internal quotations and citations omitted).

Similarly, there is a suggestion in the record of price discrimination, which also is recognized in this Circuit as a form of anticompetitive conduct that can establish a § 2

---

**36.** While some courts have required a showing that the defendant either attained or attempted to attain a monopoly in the leveraged market, *see, e.g., Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 547 (9th Cir.1991), *cert. denied,* 503 U.S. 977, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992), the Sixth Circuit declined to adopt this standard in *Kerasotes,* stating:

We expressly reject the district court's reasoning that leverage or the abuse of monopoly power is not actionable when the offender has not yet acquired a dominant position in the affected market .... Products that may be inferior should not be allowed to prosper in a particular market as a result of [their] producer's exploitation of its

monopoly position in a second market. Under such situations, potential economic or competitive gains are not identifiable. This is, of course, most clearly so where the alleged offender has used coercion in the market where it validly possesses monopoly power to further extend that power to a second market. Finally, we observe that the antitrust laws prohibit not just the possession of monopoly power but also attempts to restrain trade and impede competition. Thus, it is not determinative that [the defendant] may not presently enjoy a dominant market power position in ... the affected market.

*Kerasotes,* 854 F.2d at 137–38.

violation.[37] In particular, the Sixth Circuit observed in *Byars, supra,* that vertical integration is not *per se* unlawful, but that it may be deemed so where it "facilitates price discrimination so that the monopolist can reap the maximum monopoly profit from different consumers." *Byars,* 609 F.2d at 861. In this case, an Airline's hidden-city prohibition is precisely designed to ensure that two different classes of passengers pay different fares, even though they are sitting alongside each other on the very same airplane traveling the same hub-spoke route. Plaintiffs assert that this fare differential is attributable to the Airlines' market dominance at their hub airports, giving them the power to impose higher fares on their hub-spoke passengers. Defendants respond that their fare structures, with their hidden-city pricing anomalies, are the product of legitimate competitive considerations. This, of course, is a core factual question in this case, and must be resolved by the trier of fact on a complete evidentiary record.

To be sure, a leading treatise of antitrust law advises the judiciary to proceed with caution in cases of alleged price discrimination, opining that this practice "has ambiguous effects on consumer welfare and entry by competitors." Areeda & Hovenkamp, *supra,* ¶ 721e, at 270. Even where a court might be reasonably confident of the anticompetitive effects of such a practice, there is the difficulty of fashioning appropriate relief, which generally would entail a determination of the appropriate "competitive" price. *See id.,* ¶ 721e, at 268–70. Here, however, Plaintiffs have produced evidence that hub-spoke passengers have been compelled to pay supracompetitive fares, and that barriers to entry have thwarted the usual market forces that would correct this situation. They further submit that the appropriate competitive fares for hub-spoke travel are estimable by resort to the Airlines' hidden-city fares, which encompass the same hub-spoke travel but are set under competitive conditions. Once

again, the Court need not decide at this juncture whether Plaintiffs' economic model is correct. It is enough that it provides a plausible basis for finding anticompetitive conduct, and that it enjoys sufficient support in the record. The Court finds that Plaintiffs have met these threshold requirements.[38]

Admittedly, these concerns of leveraging and price discrimination rest largely upon economic theory at this point, and their existence has yet to be established. Plaintiffs, however, are not the moving party—they need not prove their case here, but need only identify factual disputes as to the issues raised by Defendants. In this context, Plaintiffs' heavy reliance on the Court's prior Opinion, and their failure to offer much in the way of concrete evidence regarding anticompetitive effects in the interbrand market, appear to be in-kind responses to the broad-brush arguments put forward in Defendants' motion. By citing bright-line (and often inapposite) rules and advancing a superficial view of the marketplace, Defendants have done little to elicit a more thorough and sophisticated market analysis, much less to show that any such analysis must be resolved in their favor as a matter of law. The Court is confident that none of the broad principles relied upon by Defendants establishes the *per se* lawfulness of their hidden-city prohibitions. Moreover, the Court's tentative assessment of the marketplace, undertaken with little assistance from the parties, fails to lead to a firm conclusion, as a matter of law, that the Airlines' prohibitions raise no anticompetitive concerns. Accordingly, Defendants are not entitled to summary judgment in their favor on Plaintiffs' § 2 claims.

## IV. *PLAINTIFFS' MOTION FOR CLASS CERTIFICATION*

### A. The Standards Governing Plaintiffs' Motion

As noted at the outset, Plaintiffs filed a motion on November 15, 2000, requesting

---

**37.** "Price discrimination occurs when a firm obtains different rates of return from different groups of customers." III Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 721a, at 262 (2d ed.2002).

**38.** In its earlier Opinion addressing the proposed testimony of Plaintiffs' experts, the Court ex-

pressed serious reservations about the use of hidden-city fares as a measure of the purported hub premiums imposed by the Airlines on their hub-spoke passengers. Nevertheless, the Court found that the experts' testimony on this point satisfied the threshold standards for admissibility under Fed.R.Evid. 702.

certification of three classes under Fed. R.Civ.P. 23, with one of these classes, in turn, encompassing three subclasses. First, with regard to Plaintiffs' request for an order enjoining Defendants from enforcing their prohibitions on hidden-city ticketing, Plaintiffs seek certification of a class consisting of all persons or entities who will purchase a ticket from one of the Airline Defendants for travel originating or terminating at one of these Airlines' hub airports. Second, Plaintiffs move for certification of a class under their Section 1 antitrust conspiracy theory, with this class consisting of all persons or entities who purchased an unrestricted full-fare ticket from one of the Airline Defendants for travel on an "Affected City–Pair" route—namely, some (but not all) of the routes originating or terminating at one of Defendants' hub airports. Third, for each of Plaintiffs' Section 2 antitrust claims against the three individual Airline Defendants, Plaintiffs request certification of a subclass of persons or entities who purchased an unrestricted full-fare ticket from the relevant Airline for travel on an "Affected City–Pair" route, excluding any shared hub-to-hub routes.[39]

Plaintiffs' motion is governed by Federal Rule of Civil Procedure 23, which provides in pertinent part:

(a) **Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) **Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the courts finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23.

As is clear from the text and structure of Rule 23 itself, a proposed class action must satisfy each of the four prerequisites of subsection (a), and must then qualify under at least one of the three categories set forth in subsection (b). *See In re American Medical Systems, Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996); *Fuller v. Fruehauf Trailer Corp.,* 168 F.R.D. 588, 594 (E.D.Mich.1996). Plaintiffs, as the parties seeking class certification, bear the burden of establishing that these requirements are satisfied; "[a] class is not maintainable as a class action by virtue of its designation as such in the pleadings." *In re American Medical Systems,* 75 F.3d at 1079. Further, the Supreme Court has cautioned that a class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Telephone Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

---

**39.** Membership in the latter two classes is limited to those who purchased tickets within a defined "class period," which began on (i) October 10, 1992 with respect to Defendant Northwest, (ii) May 18, 1995 for Defendant U.S. Airways, and (iii) June 11, 1995 for Defendant Delta.

## B. Plaintiffs Have Satisfied the Four Prerequisites of Rule 23(a).

The four elements of Rule 23(a) "have been given the shorthand designations of 'numerosity, commonality, typicality, and adequacy of representation.'" *Fuller,* 168 F.R.D. at 595 (citation omitted). In challenging Plaintiffs' showing under Rule 23(a), Defendants devote little or no discussion to the issues of numerosity and commonality, and instead focus on adequacy and, especially, typicality. Consequently, the Court, too, will move rather quickly through the first two elements of Rule 23(a), and then will examine in depth the more controversial issues.

### 1. Numerosity

■■■■ Rule 23(a) requires that the proposed class be "so numerous that joinder of all members is impracticable." There is "no strict numerical test for determining impracticability of joinder," *In re American Medical Systems, supra,* 75 F.3d at 1079, and "[t]he mere allegation that the class is too numerous to make joinder practicable, by itself, is not sufficient to meet this prerequisite." *Fleming v. Travenol Laboratories, Inc.,* 707 F.2d 829, 833 (5th Cir.1983). Instead, "a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1038 (5th Cir.1981). In general, the numerosity inquiry "requires examination of the specific facts of each case," *In re American Medical Systems, supra,* 75 F.3d at 1079 (internal quotations and citations omitted), and turns upon such factors as the dispersion of class members across a wide geographic area and the ease of identifying class members, *see Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 131–32 (1st Cir.1985), *cert. denied,* 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986).

■■■■ Plaintiffs readily satisfy this prerequisite here. They estimate that the proposed classes number in the hundreds of thousands, if not millions, and it is fair to assume that the class members are located across the nation, as the purported "Affected City–Pairs" span from coast to coast. Under these circumstances, joinder is impracticable, and the numerosity requirement is established.

### 2. Commonality

■■■■ Next, the "commonality" element of Rule 23(a) requires that there be "questions of law or fact common to the class." Complete identity of issues is not required; rather, it is enough if the resolution of one particular issue will affect all or a significant number of the members of the putative class. *Fuller,* 168 F.R.D. at 595–96. For example, "[w]here the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected." 168 F.R.D. at 595 (internal quotations and citation omitted). Yet, "not every common question ... will suffice," because "at a sufficiently abstract level of generality, almost any set of claims can be said to display commonality." *Sprague v. General Motors Corp.,* 133 F.3d 388, 397 (6th Cir.), *cert. denied,* 524 U.S. 923, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998). "What we are looking for is a common issue the resolution of which will advance the litigation." 133 F.3d at 397.

■■■■ Here, there are many such common issues. Regarding Plaintiffs' Section 1 claim, an obvious commonality is the question whether the Defendant Airlines agreed upon a common course of action to eliminate hidden-city ticketing. The resolution of this issue will either defeat Plaintiffs' Section 1 claim, if there was no such agreement, or will go far toward establishing a Sherman Act violation, if there was such collusive conduct.

Similarly, as to Plaintiffs' Section 2 claims against the individual Airlines, the Court has no trouble in identifying common issues. For example, Plaintiffs' antitrust claims against the individual Defendant Airlines rest heavily upon a hub-based approach to market definition and analysis, under which an Airline's purported monopoly power in a given city-pair market allegedly may be determined largely through consideration of market conditions at the hub point of origin or destination. If Plaintiffs cannot establish the

validity of this approach, and if Defendants instead prevail on their counter-theory that each route emanating from the same hub is subject to distinct competitive forces, Plaintiffs' Section 2 claims will fail for want of proof of the existence of monopoly power in each of the relevant city-pair markets. As another example, Plaintiffs' Section 2 claims will rise or fall on the question whether hidden-city savings opportunities are a product of the Defendant Airlines' exercise of monopoly power at their hubs, as Plaintiffs and their experts contend, or are, as Defendants maintain, simply a side effect of economically rational fare structures that reflect legitimate considerations such as supply and demand and quality of service. Accordingly, the Court finds that the prerequisite of commonality is satisfied.

### 3. Typicality

To satisfy the "typicality" prong of Rule 23(a), Plaintiffs must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague*, 133 F.3d at 399. While the "commonality" and "typicality" inquiries overlap to a degree, this Court previously has explained that these prerequisites "focus[ ] on two distinct questions":

> Under the commonality prong, a court must ask whether there are sufficient factual or legal questions *in common* among the class members' claims to make class certification economical and otherwise appropriate. In contrast, under the typicality prong, a court must ask whether, despite the presence of common questions, each class member's claim involves so many *distinct* factual or legal questions as to make class certification inappropriate .... In short, commonality focuses on similarities, while typicality focuses on differences.

*Fuller*, 168 F.R.D. at 597–98.

This prerequisite, and the related requirement of predominance under Rule 23(b)(3), is at the heart of the parties' dispute as to the propriety of class certification. Defendants'

brief in opposition to Plaintiffs' motion is replete with examples of the "individualized proof" that purportedly will be needed for each class member to establish his or her entitlement to relief. Thus, according to Defendants, the evidence in support of a given class representative's claim would do little or nothing to demonstrate that anyone else has suffered an antitrust injury. Specifically, Defendants assert that individualized inquiry is required to resolve the following issues: (i) whether Plaintiffs' "Affected City–Pairs" properly delineate the product and geographic markets in which a particular ticket purchase occurred; (ii) whether a Defendant Airline possesses monopoly power in each relevant city-pair market; (iii) whether (and which) hidden-city fares may serve as appropriate benchmarks for determining a truly "competitive" fare, thereby constituting cognizable evidence of an Airline's alleged exercise of monopoly power, and of the impact of this alleged exercise upon the members of the class; (iv) whether each individual class member suffered injury as a result of a Defendant's allegedly illegal conduct; (v) what damages, if any, can be proven by each class member; and (vi) whether a class member was fully reimbursed for his or her travel, and therefore would be ineligible to collect damages.

The Court will address each of these matters in turn. Before doing so, however, the Court wishes to offer two general observations which, as will be seen, bear heavily on most or all of the several issues raised by Defendants. First, while it is evident that Defendants have a number of problems with the analysis offered by Plaintiffs' experts, and that the two sides' experts reach diametrically opposed conclusions on a number of points, it is equally clear that, "[a]t this stage, the Court should not delve into the merits of an expert's opinion or indulge 'dueling' between opposing experts." *In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 297, 311 (E.D.Mich.2001); *see also Caridad v. Metro–North Commuter Railroad*, 191 F.3d 283, 293 (2d Cir.1999), *cert. denied*, 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000); *In re Disposable Contact Lens Antitrust Litigation*, 170 F.R.D. 524, 531

(M.D.Fla.1996); *In re Domestic Air Transp. Antitrust Litigation,* 137 F.R.D. 677, 692 (N.D.Ga.1991) ("It is not the function of the Court at this time to determine whether Dr. Beyer is correct."). Rather, it is enough that Plaintiffs and their experts have put forward a "colorable method" of establishing their antitrust claims through generalized, class-wide proof. *Disposable Contact Lens Antitrust Litigation,* 170 F.R.D. at 531.[40]

Next, while Defendants make much of the complexity of the economics of the airline industry, and contend that the determination of each fare involves myriad context-specific considerations, Plaintiffs remind the Court that this precise argument has been made, and emphatically rejected, in the past:

> It is now the task of the Court to determine the propriety of class certification in this action. While the determination requires consideration of many issues, the overriding question before the Court today is whether participants in a massive, nationwide industry are exempted from the purview of the civil antitrust laws of the United States because of their ability to portray the class as so large and the industry as so complex and complicated that an action to hold the participants accountable for the injuries they have caused cannot possibly be brought as a class action.

*Domestic Air Transp. Antitrust Litigation,* 137 F.R.D. at 683. Although the issues involved in *Domestic Air Transp. Antitrust Litigation* are by no means identical to those presented here, Judge Shoob's analysis nevertheless carries much persuasive force in this case, where the Airlines again seek to avoid class certification in an antitrust action challenging an aspect of their hub-and-spoke systems. Like Judge Shoob, this Court finds that the Airlines have dramatically overstated the idiosyncracies of the claims and defenses in this case.

### (a) Plaintiffs' Hub–Based Market Analysis

In arguing that their antitrust claims are amenable to generalized, class-wide proof, and that their individual claims are typical of those of the class as a whole, Plaintiffs advance a market analysis that focuses upon the Defendant Airlines' hub airports. Specifically, they and their experts posit (i) that the relevant product market is air travel, and that other modes of transportation need not be considered in light of the 150–mile minimum used to identify the relevant city-pairs; (ii) that the relevant geographic markets are city-pairs emanating from or terminating at a hub airport, with each "city" encompassing all airports within a single metropolitan area; and (iii) that the existence of monopoly power in each city-pair market can be determined largely by reference to conditions at the hub end of the route. Defendants argue that these generalizations are unwarranted, and that the proper inquiry, focusing on each individual city-pair, would lead to the conclusion that a given Plaintiff's claim is typical only of, at best, those claims involving precisely the same city-pair.

▆▆▆ Initially, as Plaintiffs point out, Defendants' challenges to Plaintiffs' market analysis do not affect the question of class certification with respect to Plaintiffs' Section 1 claims. As explained earlier, the agreement alleged by Plaintiffs, if proven, likely would be subject to only an abbreviated or "quick look" form of Rule of Reason analysis, and Plaintiffs would not be called upon to produce a detailed market-by-market analysis of the anticompetitive effects of Defendants' alleged agreement. *See California Dental Ass'n v. Federal Trade Comm'n,* 526 U.S. 756, 769–70, 119 S.Ct. 1604, 1612–13, 143 L.Ed.2d 935 (1999). In any event, any weakness in Plaintiffs' analysis of a particular city-pair market seemingly would have no bearing on their § 1 claim, where there is no evidence that any Airline has ever even considered a partial prohibition on hidden-city ticketing, depending on the conditions in a particular market. Even under a full-blown Rule of Reason analysis, then, there is no

**40.** As noted earlier, Defendants argued in a separate motion that the methodology of Plaintiffs' experts is so flawed, and that the fit is so poor between their expert opinions and the facts of this case, that their conclusions must be discounted for purposes of resolving the present motions. The Court recently addressed this question in a separate Opinion and Order, holding that the opinions of Plaintiffs' experts survive gatekeeping scrutiny under Fed.R.Evid. 702.

reason to think that the outcome will turn upon market-to-market distinctions; rather, in this regard, Plaintiffs and Defendants alike seemingly are proceeding under the assumption that the economics of the industry are largely driven by the nature and characteristics of a hub-spoke network. In short, any alleged defects in Plaintiffs' market analysis are of no consequence to their request for class certification of their antitrust conspiracy claim.

Next, regarding the product and geographic scope of Plaintiffs' market definition, the Court already has concluded in a prior Opinion that Defendants' challenges go only to the evidentiary weight of Plaintiffs' expert opinions and the correctness of the conclusions drawn by those experts, but do not provide a basis for altogether excluding these opinions. Moreover, Defendants' quibbles do not render Plaintiffs' claims any less susceptible to class-wide or generalized proof. Whether, for example, the interchangeability of ground and air travel extends 150 or 300 miles, or whether certain markets (*e.g.*, Cleveland and Akron) are so close together that they create the possibility of substitution between city-pairs, the outcome of such inquiries still would result in a largely global set of rules through which one could, as a matter of common proof, ascertain the proper set of city-pair markets. As Plaintiffs note, any broader attack on the use of city-pairs surely cannot succeed, where the airlines themselves, as well as numerous government and academic reports, have adopted this same general approach to analyzing the air travel industry. In short, while Defendants' challenges might lead to a *shorter list* of city-pairs than the one offered by Plaintiffs' experts, they do not call into question Plaintiffs' overall city-pair approach to market analysis, nor do they require anything approaching 234 separate "trials" to determine the relevant markets.

Finally, Defendants accuse Plaintiffs' experts of making an unwarranted leap from hub-based to market-wide findings of monop-

oly power, and they argue that it is necessary to separately examine each of Plaintiffs' 234 city-pairs for the presence of such power. Again, however, the Court has already held that Plaintiffs will be permitted to present their somewhat "hub-skewed" market analysis to the trier of fact. More generally, in their contention that individualized proof will be necessary to establish the requisite monopoly power in each city-pair market, Defendants overlook the core premise of Plaintiffs' Section 2 claims. Plaintiffs' entire Section 2 case rests upon the allegation that, by virtue of each Defendant's alleged monopoly power at its hub airports, Defendants are able to impose "hub premiums" on many passengers traveling to or from their hubs, thereby giving rise to hidden-city savings opportunities. Plaintiffs do not contend that this is an isolated city-specific phenomenon, but a generalized occurrence on many of the routes emanating from Defendants' hub airports. In other words, a hub monopoly, and its attendant effect on the bulk of city-pair fares involving a hub, is the lynchpin of Plaintiffs' Section 2 claims. If Plaintiffs are unable to persuade the trier of fact that each Defendant possesses such power at its hub airports, then Plaintiffs' claims must fail, irrespective of whether a given Airline might be found to possess monopoly power on this or that city-pair route.

Consequently, if Defendants believe that Plaintiffs and their experts are guilty of sweeping generalization, or that they have overlooked contrary data, in their haste to claim broad monopoly power, it should be a relatively easy matter for Defendants to disprove Plaintiffs' core thesis at trial, and Defendants certainly are entitled to introduce market-specific evidence in their effort to do so. Notwithstanding such defenses, however, Plaintiffs' claims, as alleged, surely are amenable to generalized, class-wide proof, and any traveler on a city-pair route involving a particular hub is just as "typical" as any other for purposes of proving these claims.[41] Indeed, under the present record,

---

**41.** For this reason, the Court rejects Defendants' related "standing" argument—*i.e.*, that each named Plaintiff can serve as the representative for only those class members who traveled on

precisely the same city-pair route. Under the hub-based market theory advanced by Plaintiffs and their experts, the antitrust injury allegedly suffered by any particular named Plaintiff would

it is clear that Plaintiffs can *only* succeed if this is so, because, as Defendants correctly point out, Plaintiffs and their experts have not undertaken any sort of route-by-route market analysis that might support a narrower species of Section 2 claim.

### (b) Plaintiffs' Use of Hidden–City Fares as Benchmarks for Allegedly Supracompetitive Hub–Spoke Fares

As their next challenge to Plaintiffs' showing of typicality, as well as predominance, Defendants question the "triple duty" purposes for which Plaintiffs and their experts propose to offer evidence of hidden-city savings opportunities. As observed by Defendants, Plaintiffs point to these savings opportunities as (i) further evidence that Defendants possess monopoly power at their hub airports; (ii) the requisite proof, under both Section 1 and Section 2, of the anticompetitive effect of Defendants' actions; and (iii) evidence of the existence and extent of the injury suffered by each member of the class. According to Defendants, each one of these purposes opens the door to individualized proofs that defeat any claim of typicality or predominance of common issues.

 Defendants' first challenge, to the use of hidden-city savings opportunities as evidence of monopoly power, merits little discussion. As observed in the Court's prior Opinion addressing the admissibility of the expert testimony proffered by Plaintiffs, Plaintiffs and their experts point to hidden-city savings opportunities merely as "confirm[ing] defendants' exercise of monopoly power," (Plaintiffs' Exhibits, Tab 71, Beyer Expert Report at ¶ 17), and not as conclusive proof of the existence of such power. Defen-

dants are free to offer evidence—*e.g.,* instances of so-called "negative" hidden-city savings, where a spoke-hub-spoke fare is higher than the fare for traveling the included hub-spoke route—to rebut these claims of monopoly power.

Defendants' remaining two challenges are related, for a simple reason. In particular, given that the crux of Plaintiffs' claims of anticompetitive conduct, under both Section 1 and Section 2, is the denial of any opportunity to capture the hidden-city savings opportunities that would be available but for the Airlines' prohibition on hidden-city ticketing, it is hardly surprising that Plaintiffs would point to these savings opportunities *both* (i) as proof of Defendants' anticompetitive conduct, *and* (ii) as establishing the existence and extent of each class member's injury as a result of that conduct. Defendants, of course, need not acknowledge the merit of Plaintiffs' theories of liability, but they surely must recognize, at this late date in these proceedings, that Plaintiffs' claims rest upon the premise that hidden-city savings opportunities are a reflection of supracompetitive hub premiums imposed by the Defendant airlines. Similarly, though Defendants might strongly disagree with the expert analysis through which Plaintiffs seek to support this proposition, there is no question that the opinions offered by Plaintiffs' experts *do* support their contentions as to the significance of hidden-city savings opportunities.

Thus, it appears, once again, that Defendants wish the Court to weigh the respective opinions of the parties' experts. · This the Court cannot do. The Court fully appreciates that, in the view of Defendants and their experts, the fares for a given spoke-hub-

be precisely the same as that purportedly suffered by any other passenger who flew into or out of the same hub—namely, the deprivation, by virtue of the exercise of a Defendant's alleged monopoly power, of the opportunity to purchase a hidden-city ticket at a lower fare that would provide the same "product" as a hub-spoke ticket reflecting the passenger's true itinerary. Given the highly similar nature of the claims of all passengers traveling to or from the same hub, minor factual distinctions—*e.g.,* different fares over time—do not defeat typicality. *See Domestic Air Transp. Antitrust Litigation,* 137 F.R.D. at 699.

Having said that, the Court is concerned that the named Plaintiffs might not have purchased tickets involving all seven of the hub airports at issue here. While it might not be necessary in this case to undertake a detailed market analysis for each and every city-pair, such an analysis seemingly is needed for each hub, and all class members who traveled to or from a given hub presumably should be able to look to a particular representative to pursue their claims. Accordingly, the Court leaves this matter open for further consideration.

spoke route and its included hub-spoke route are determined by two wholly distinct sets of competitive factors, so that one route cannot readily be compared to the other.[42] Yet, accepting as true Plaintiffs' contrary premise that, in light of Defendants' monopoly power at their hub airports, hub-spoke fares are relatively immune from competitive pressures, it is not wholly irrational to look to (purportedly competitive) fares on the spoke-hub-spoke routes that encompass these allegedly monopolized hub-spoke route as providing some indication of the existence and extent of the "hub premiums" charged by the airline. Moreover, this proposed measure achieves greater probative value if one accepts Plaintiffs' further contention—again, challenged by Defendants—that, if the Airlines' hidden-city prohibitions were lifted, their likely response would be to lower their hub-spoke fares to eliminate any hidden-city savings opportunities. The fare that would be paid by a class member but for a Defendant's alleged antitrust violation seemingly provides a good benchmark for measuring the extent of the injury caused by such a violation.

The Court previously has recognized that the hidden-city benchmark analysis put forward by Plaintiffs' expert, Dr. Beyer, must confront a number of difficult questions, including: (i) how it can be that considerably fewer than all of the spoke-hub-spoke "hidden-city" routes offer opportunities for savings;[43] and (ii) how a widely disparate set of hidden-city fares, averaged together, can serve as a good estimate of the "hub premium" that the Airlines have imposed through their prohibitions against hidden-city ticketing.[44] Obviously, the explanations offered by Plaintiffs and their experts on these and other points must survive across-the-board scrutiny, and Defendants, of course, are free to offer evidence that tends to undermine Plaintiffs' attempt to establish unlawful overcharges through generalized proofs. Under the present record, however, the Court finds that Plaintiffs' benchmark analysis appears amenable to class-wide treatment, and that it poses no particular obstacle to Plaintiffs' satisfaction of the prerequisites of typicality and predominance.

### (c) Plaintiffs' Proof of Antitrust Injury

Next, Defendants argue that Plaintiffs' proposed common proof of antitrust injury glosses over or ignores several individualized elements of each class member's relevant ticket purchases. In particular, Defendants contend that each class member would need to show (i) that he would have purchased a hidden-city ticket if such a practice was not prohibited by Defendants; (ii) that, despite possible issues of limited seat availability and inventory management, he could have located and purchased a hidden-city ticket for the desired date and time of travel that achieved

---

42. Indeed, in its recent Opinion addressing Defendants' various challenges to the opinions of Plaintiffs' experts, the Court discussed this point at length, and acknowledged that such comparisons raise a number of legitimate concerns.

43. Dr. Beyer has endeavored to explain this phenomenon, attributing it to such factors as differences in travel distances and natural monopolies on certain spoke-spoke routes. As to the latter, for example, if the hub-spoke route at issue is Detroit to Cincinnati, Ohio, it would not necessarily be surprising that a Seattle–Detroit–Cincinnati route did not offer a hidden-city savings opportunity.

44. Defendants note, for example, that Dr. Beyer has proposed 29 routes (with 128 separate fares) as benchmarks for the allegedly supracompetitive fare charged by Defendant Delta in a *single* market, Albany–Atlanta. Obviously, some of these benchmarks achieve higher savings, and some lower. The question becomes, then, how

to isolate the portion of this savings that represents a "hub premium" due to the Airlines' hidden-city prohibitions, and how to explain the remaining differences among all the various savings opportunities once this premium is removed.

Dr. Beyer apparently endeavors to resolve these issues by applying a "minimum average" method of computation, under which the average hidden-city savings percentage is calculated for each fare code on a quarterly basis. Dr. Beyer then chose the fare code that achieved the smallest average savings percentage as his benchmark for the alleged anticompetitive overcharge for that quarter. For example, upon reviewing the Albany–Atlanta market on the date of September 19, 1995, Dr. Beyer found that the average savings percentages under the six applicable fare codes ranged from 11.5 to 14 percent. He used the smallest of these averages—11.5 percent—as the alleged overcharge imposed by Defendant Delta on its passengers traveling between Albany and Atlanta during this quarter in 1995.

the benchmark level, or at least some level, of savings; and (iii) that, in the "but for" world in which the Airlines could not prohibit hidden-city ticketing, he would have paid a lower fare for his travel on an affected city-pair route.

The Court finds the latter issue largely dispositive, and thus addresses the first two points only briefly. The courts have recognized that, for purposes of determining whether to certify a class, the "impact" element of an antitrust claim need not be established as to each and every class member; rather, it is enough if the plaintiffs' proposed method of proof promises to establish "widespread injury to the class" as a result of the defendant's antitrust violation. *See In re NASDAQ Market–Makers Antitrust Litigation,* 169 F.R.D. 493, 523 (S.D.N.Y.1996). In other words, "at the class certification stage, Plaintiffs must show that antitrust impact *can be proven* with common evidence on a classwide basis; Plaintiffs need not show antitrust impact *in fact occurred* on a classwide basis." *In re Polypropylene Carpet Antitrust Litigation,* 178 F.R.D. 603, 618 (N.D.Ga.1997). The evidence offered by Plaintiffs and the opinions propounded by their experts, if credited, would establish, as a general matter amenable to common proof, that many class members would have sought out and purchased hidden-city tickets, and that the practice would have become widespread, if the Airlines had not acted to prohibit it.

Next, regarding the near-endless parade of scenarios advanced by Defendants as to the state of the "but for" world if hidden-city ticketing could not be prohibited, the Court again declines Defendants' invitation to weigh in on the battle of the experts. Plaintiffs' experts have offered a variety of explanations why, in their view, the Airlines likely would respond by lowering their hub-spoke fares to eliminate any hidden-city savings opportunities. Principally, these experts contend (i) that raising spoke-spoke fares to accomplish the same result would threaten to undermine the viability of the Airlines' hub-spoke networks by decreasing the crucial flow of passengers through the hubs; and (ii) that a do-nothing response, allowing the practice of hidden-city ticketing to become more widespread, would inject an unacceptable degree of chaos into Defendants' inventory control efforts as the Airlines were confronted with ever-increasing numbers of "phantom" passengers. As stated in the Court's prior Opinion addressing Plaintiffs' expert testimony, Defendants and their experts have by no means conclusively proved that these hypotheses are irrational, or that they rest upon an untenable methodology. Rather, Defendants merely claim an entitlement to prove, through market-specific evidence and otherwise, that the "but-for" world would be a great deal more complicated, with a great deal more variation in the airlines' market-by-market responses, than posited by Plaintiffs' experts.

To be sure, Plaintiffs' approach on this issue is yet one more example of the simplification that is achieved through a largely hub-based outlook on the air travel industry. But, as stated above, Plaintiffs have thoroughly demonstrated their commitment to this theory, and it is clear that their antitrust claims will rise or fall with the trier of fact's acceptance or rejection of their hub-dominated view of the marketplace. All that matters, at this stage, is that Plaintiffs' theory of liability rests upon a colorable analytical method that is susceptible to generalized proof. The Court finds that this threshold is achieved here with regard to Plaintiffs' claims of antitrust impact.

### (d) Plaintiffs' Proof of Damages

Defendants next identify various damage-related issues which, in their view, will require individualized proofs, and which, therefore, threaten to undermine the typicality of any given named Plaintiff's claims. Each of these issues has been addressed or noted above, including (i) that the lifting of the Airlines' hidden-city prohibitions would produce responses that vary from market to market, so that it is not possible to establish through generalized proofs the amount of savings that each class member would have achieved; (ii) that the benchmarking methodology of Plaintiffs' experts inappropriately incorporates an averaging technique, rather than purporting to determine with certainty the extent of damage suffered by each class

member; and (iii) that Defendants are entitled to scrutinize each proposed benchmark that goes into this averaging computation, in an attempt to show that a given hidden-city savings opportunity reflects competitive considerations (*e.g.*, low fare due to great inconvenience) rather than a "hub premium."

■ By this time, the Court's response to these arguments will come as no surprise. Certain of these issues—for example, questions about the state of the "but for" world—could only be resolved by weighing the respective opinions of the parties' experts. Others—for example, the suitability of particular benchmarks—implicate individualized *defenses* to the generalized proofs that Plaintiffs propose to offer. Again, Defendants will prevail if they are able to persuade the trier of fact that the airline industry is not so simple as suggested by Plaintiffs' hub-based market analysis. Further, to the extent that Plaintiffs' proposed method of computing damages might overstate the "hub premiums" paid by the members of the class, it should be left to the trier of fact to decide whether, and by how much, to discount any monetary award. Plaintiffs need not establish their losses to a certainty; rather, in cases like this one, "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981).

In any event, Plaintiffs have cited ample authority for the proposition that individualized damage inquiries, standing alone, do not warrant the denial of class certification, at least as to issues of liability. *See Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1196–97 (6th Cir.1988); *see also In re American Medical Systems*, 75 F.3d at 1084; *In re Visa Check/Mastermoney Antitrust Litigation*, 280 F.3d 124, 139–40 (2d Cir.2001). "District courts have correctly recognized that any other rule would eliminate antitrust class actions." *Visa Check/Mastermoney Antitrust Litigation*, 280 F.3d at 139–40 (citing cases). For purposes of resolving Plaintiffs' present motion, then, the Court need not determine precisely the procedure through which it will resolve any individualized issues of damages that might remain after the common questions of liability and antitrust impact have been addressed. It is enough to conclude, as the Court now does, that any such individualized inquiries do not sufficiently detract from the typicality of the named Plaintiffs' claims to preclude the certification of a class.

### (e) Reimbursement of the Ticket Purchase Price Paid by a Class Member or Named Plaintiff

Finally, Defendants maintain that individual proofs will be required to eliminate any "windfall" recoveries by named Plaintiffs or class members who were reimbursed—*e.g.*, by an employer—for any alleged overcharge imposed by a Defendant airline. This concern is not merely hypothetical, as, for example, Plaintiff Norman Volk has testified that he was fully reimbursed for all of the air travel for which he seeks to recover in this case. If, as Defendants contend, such reimbursement means that a class member lacks standing under the Clayton Act or Article III of the Constitution, it follows that individualized proofs will be required as to whether each class member was reimbursed for his or her relevant air travel.

As part of their debate on this issue, the parties devote considerable energy to wrangling over the significance of the Supreme Court's rulings in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). At best, however, these cases bear only tangentially upon the issues of reimbursement and standing raised by Defendants. In these decisions, the Court addressed, and largely rejected, the defensive and offensive use of a "pass-on" theory to, respectively, cut off a defendant's antitrust liability to a direct purchaser plaintiff or expand the universe of antitrust plaintiffs to include indirect purchasers. As to the former, Defendants do not claim that some class members have merely "passed on" their antitrust injuries in the form of, for example, higher prices to customers. As to the latter, Plaintiffs need not seek to expand the universe of antitrust

plaintiffs, as their proposed classes include only direct purchasers. In short, the complex questions of proof and policy judgments at issue in *Hanover Shoe* and *Illinois Brick* are not implicated here.

■ Rather, the issue here is more straightforward, albeit individual to each class member—namely, whether a given class member sustained an out-of-pocket loss as a result of a Defendant's antitrust violation, or whether this class member was made whole through reimbursement. Whatever can be said about the standing of a class member in the latter category, the case law cited by Plaintiffs uniformly confirms that this inquiry goes to the merits of each class member's claim and, therefore, is not an appropriate basis for denying class certification. *See, e.g., Rozema v. Marshfield Clinic,* 174 F.R.D. 425, 444 (W.D.Wis.1997) (distinguishing between common issues of liability, which are necessary for certification of a class, and the rights of individual class members to recover, which are not); *Domestic Air Transp., Antitrust Litigation,* 137 F.R.D. at 696.[45] More specifically, it is not necessary, at the class certification stage, for Plaintiffs to show that each and every class member could satisfy an individualized standing inquiry. *Rozema,* 174 F.R.D. at 444.

To be sure, if Plaintiffs prevail on the common issues of liability, the remaining question of standing could present a formidable challenge to the Court's resources, as the Court can find no principled basis for denying Defendants the opportunity to at least explore whether each individual class member incurred any out-of-pocket losses as a result of a Defendant's overcharge. *Cf. In re Domestic Air Transp. Antitrust Litigation,* 148 F.R.D. 297, 318 (N.D.Ga.1993) (observing, as a basis for approving a settlement, that "the passing-on defense represented one of the major obstacles to plaintiffs' recovery," where "individual determinations of the issue of reimbursement, whether at the liability or

claims administration stage, would be not only impracticable but impossible, given judicial resources"). At this juncture, however, the Court need not reach the issue, and need not yet determine how to effectively and efficiently safeguard Defendants' entitlement to insist that each class member establish a right to recovery.[46]

### 4. Adequacy of Representation

■ The fourth and final prerequisite of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." To satisfy this prong of the inquiry, it must be shown that the representatives have interests in common with, and not antagonistic to, the interests of the unnamed members of the class, and that the representatives will vigorously prosecute these interests through qualified counsel. *In re American Medical Systems,* 75 F.3d at 1083.

■ Defendants do not challenge the qualifications of Plaintiffs' chosen counsel. Rather, they argue only that there is a very real possibility of antagonistic interests among the members of the class and their named representatives, where (i) the class members must compete among themselves for a presumably limited supply of hidden-city tickets; and (ii) some passengers might be worse off if Plaintiffs succeed, as this potentially could result in an increase in at least some spoke-spoke fares and the elimination of some routes altogether. These contentions, however, implicate the conditions in the "but for" world, and therefore fall within the "battle of the experts" rubric. More generally, it is a fundamental premise of Plaintiffs' claims that each class member, as a hub passenger, has been required to pay a "hub premium" as a result of Defendants' antitrust violations. While other categories of passengers might shoulder portions of the financial burden in the event these alleged "hub premiums" are eliminated, the Court is

---

**45.** In this regard, it is noteworthy that Defendants have not moved for summary judgment in their favor on the ground of lack of standing of any named Plaintiff who has been fully reimbursed for his air travel expenses.

**46.** The Court does observe, though, that individual "mini-trials" are not inevitable here, and that various procedural mechanisms—*e.g.,* detailed questionnaires or sworn affidavits—might assist in streamlining the requisite individualized inquiries.

satisfied that Plaintiffs have reasonably defined their proposed classes to ensure that their membership is limited to those who stand to benefit in the event that Plaintiffs prevail.

## C. Class Certification Is Appropriate Under Rule 23(b)(3).

■ Having met the threshold requirements of Rule 23(a), Plaintiffs next must show that their proposed classes satisfy the conditions of at least one of the subdivisions of Rule 23(b). Plaintiffs propose that their "injunctive class" be certified under Rule 23(b)(2), and that the remaining classes be certified under Rule 23(b)(3). The Court finds, however, that Plaintiffs' proposed "damage" classes can serve as appropriate vehicles for the award of both monetary and injunctive relief, and that it is unnecessary to certify a separate, not to mention broader, class for purposes solely of determining whether to award the latter form of relief.

As Defendants observe, certification under Rule 23(b)(2) generally has been held to be inappropriate where the principal relief sought is money damages. *See, e.g., Visa Check/Mastermoney Antitrust Litigation,* 280 F.3d at 146–47; *Lemon v. International Union of Operating Eng'rs,* 216 F.3d 577, 580–81 (7th Cir.2000). As explained by the Seventh Circuit:

> [T]he problem is that Rule 23(b)(2) provides for binding litigation on all class members without guarantees of personal notice and the opportunity to opt out of the suit. By virtue of its requirement that the plaintiffs seek to redress a common injury properly addressed by a class-wide injunctive or declaratory remedy, Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive and homogenous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members. A suit for money damages, even if the plaintiffs seek uniform, class-wide equitable relief as well, jeopardizes that presumption of cohesion and homogeneity because individual claims for compensatory or punitive damages typ-

ically require judicial inquiry into the particularized merits of each individual plaintiff's claim.

> Indeed, in recognition of the potential divergence of interests within the class, each class member in actions for money damages is entitled as a matter of due process to personal notice and an opportunity to opt out of the class action. Accordingly, Rule 23(c)(2) guarantees those rights for each member of a class certified under Rule 23(b)(3). However, the Federal Rules of Civil Procedure do not provide comparable procedural guarantees of those rights for a class certified under subsections (b)(1) or (b)(2), and as a result, Rule 23(b)(2) certification does not ensure personal notice or opportunity to opt out even if some or all the plaintiffs pray for monetary damages.

*Lemon,* 216 F.3d at 580 (citations omitted). These concerns are implicated here, where Plaintiffs seek substantial monetary damages (on the order of $950 million) on behalf of hundreds of thousands of air travelers, but where, as noted, there are significant hurdles in the way of Plaintiffs' attempt to establish these damages through generalized proofs.

Consequently, if Plaintiffs are able to satisfy the dictates of Rule 23(b)(3), the Court sees no need to determine whether they also might satisfy subsection (b)(2) with regard to a separate class seeking only injunctive relief. *See Visa Check/Mastermoney Antitrust Litigation,* 280 F.3d at 147 (declining to determine the correctness of the District Court's ruling that a class could be certified under Rule 23(b)(2), where the Court already had upheld the certification of the class under subsection (b)(3)). This additional inquiry seems particularly unnecessary where the injunctive relief sought by the proposed separate class could just as easily be pursued by the various "damages" classes, and where such equitable relief, if awarded, would accrue to the benefit of all members of the proposed "injunctive only" class. Further, where the questions of liability significantly overlap, and indeed appear to be virtually identical, it would disserve judicial economy to certify separate "injunction" and "damage" classes.

Accordingly, the Court next inquires whether Plaintiffs have satisfied subsection (b)(3). To do so, Plaintiffs must demonstrate (i) that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and (ii) that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). The issue of predominance has been thoroughly addressed and resolved above, as Defendants' various challenges on the Rule 23(a) requirement of typicality—*i.e.*, that the claims of the individual named Plaintiffs are replete with individualized issues, and hence are not typical of the claims of class members generally—are merely the flip-side of their challenges to predominance—*i.e.*, that each class member's claims, like those of the named Plaintiffs, are replete with individualized inquiries. Thus, without in any way diminishing the opportunity of Defendants to show that Plaintiffs' and their experts' assertions of predominance are flawed, the Court nevertheless finds, for present purposes, that Plaintiffs' proposed method of proving liability rests upon predominantly common questions of law and fact.

This leaves only the question whether a class action is superior to other methods of adjudicating Plaintiffs' claims. As was held in *Domestic Air Transp. Antitrust Litigation*, this Court finds, similarly, that "a class action [is] the *only* fair method of adjudication for plaintiffs," as the "individual claims of many class members are so small that the cost of individual litigation would be far greater than the value of those claims." *Domestic Air Transp. Antitrust Litigation*, 137 F.R.D. at 693–94. Moreover, assuming the validity of Plaintiffs' hub-based analysis of the airline industry, a class action properly reflects that each passenger who travels into or out of the same hub airport is in the "same boat," so to speak, at least as to most issues.

Regarding Defendants' suggestion that a class action would be unmanageable, and hence not "superior," this rests upon the proposition that "this case would require separate full-blown trials on the elements of violation for each of the hundreds of alleged markets in this case, and on injury and damages for each of the millions of members of the proposed class." (Defendants' Response Br. at 44.) These various contentions have already been addressed, and the Court need not revisit its analysis or conclusions. It is enough to point out, once again, that the Airlines' success in persuading the trier of fact to reject Plaintiffs' hub-dominated market analysis will largely determine the fate of each and every class member's claim, because Plaintiffs clearly are not in a position to offer additional, market-by-market evidence in the event that their hub-based evidence is discounted. Indeed, far from providing a basis for denying class certification, Defendants merely have identified a *common defense* to the claims of all class members, albeit one that rests upon a substantial volume of evidence as to allegedly differing conditions among the various city-pair markets. Consequently, the Court finds that Plaintiffs have established the prerequisites for class certification under Fed.R.Civ.P. 23(b)(3).[47]

## V. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiffs' November 15, 2000 Motion for Class Certification is GRANTED IN PART, with the exception of Plaintiffs' request for certification of a separate class under Fed.R.Civ.P. 23(b)(2) seeking purely injunctive relief. IT IS FURTHER ORDERED that the Airline

---

47. This general ruling leaves a number of subsidiary procedural matters yet to be resolved. As noted earlier, for instance, it could be argued that each hub airport presents a sufficiently distinct set of circumstances to warrant the creation of subclasses. In addition, there are questions as to precisely the sort of notice Plaintiffs must provide to potential class members, and the degree to which this notice should attempt to anticipate the individualized "standing" concern alluded to earlier. Counsel should be prepared to discuss these and other outstanding procedural issues at a forthcoming status conference to be set by the Court.

Defendants' November 15, 2000 Motion for Summary Judgment is DENIED.